The appellant was convicted of capital murder, on a finding of guilt on a two-count indictment, charging him with the murder of Emily Jordan Hannah during the commission of a robbery/murder of Emily Jordan Hannah during the commission of a burglary. Following his conviction, a sentencing hearing was held before the jury. The jury recommended a sentence of death, by a vote of 10 to 2. Thereafter, following a separate sentencing hearing before the trial judge, the appellant was sentenced to death by electrocution.
This court adopts the trial court's findings of fact in the court's sentencing order, summarizing the crime and the appellant's participation therein, in which the court stated:
 "The body of Emily Jordan Hannah, age 90, was discovered by Mrs. Lillian Moore, a relative, on Monday, Labor Day, September 5, 1988, at approximately 10:45 a.m. Mrs. Moore found Mrs. Hannah lying on the living room floor of her residence in Marion, Perry County, Alabama. Within minutes of Mrs. Moore's discovery, Max Calloway arrived at Mrs. Hannah's residence for the purpose of taking her to a Labor Day barbecue. It was upon his arrival that he met Mrs. Moore, who informed him of Mrs. Hannah's death. Mr. Calloway immediately telephoned the Marion Police Department and the scene was secured by Marion Police Chief, John Anderson. It was apparent to Chief Anderson that Mrs. Hannah had been severely beaten and stabbed. Shortly thereafter, Sgt. Roscoe Howell, Alabama Bureau of Investigation, arrived and began processing the crime scene. Sgt. Howell was assisted in the processing of the scene by ABI Latent Print Examiner, Marietta Prevost, and the Department of Forensic Sciences Medical Examiner, Mike Lee.
 "During the course of the investigation at [the] Hannah Residence, it was discovered that Mrs. Hannah's 1986 Chevrolet Celebrity vehicle was missing. A radio dispatch was made to all surrounding law enforcement agencies describing the Hannah vehicle. Approximately one (1) hour later, the Hannah vehicle was discovered on Highway #14 in Hale County, approximately 10 to 15 miles from the Hannah residence. That same afternoon, Marion police received a telephone call from Hale County Sheriff, Chester Colvin, who informed Chief Anderson that he had arrested the driver of the 1986 Chevrolet Celebrity on Sunday, September 4, 1988, for a traffic charge, and that the driver was still in the Hale County jail. The person identified as the [driver] of the vehicle was the defendant, Ronald Terry Kynard.
 "At approximately 6:22 p.m., Ronald Terry Kynard was interviewed by Sgt. Howell at the Hale County courthouse in Greensboro, Alabama. After being advised of his rights, Mr. Kynard stated that he had no knowledge that the 1986 Chevrolet Celebrity had been stolen. He further stated that he was not aware of the murder of Emily Jordan Hannah. Mr. Kynard first stated that he had observed the car on Friday, September 2, 1988, being driven by his brother, Lee Arthur Kynard, in Marion, Alabama. Ronald Terry Kynard admitted to borrowing the car from his brother on both Saturday and Sunday. During this conversation, Mr. Kynard began to change his statement, admitting that he did know of the murder of Emily Jordan Hannah. However, according to Mr. Kynard, Lee Arthur Kynard told him that he had murdered Mrs. Hannah and had taken the defendant into the Hannah residence to view the body of Mrs. Hannah. The defendant gave law enforcement officers several possible locations where his brother could be located. Subsequent to this initial interview, Mr. Kynard was fingerprinted by Marietta Prevost and transported to the Marion City Hall.
 "A second interview with the defendant was conducted that same night at approximately 11:30 p.m. It was during the second interview that Ronald Terry Kynard stated that he had caused the death of Emily Jordan Hannah. More particularly, Mr. Kynard stated that on Friday, September 2, 1988, at approximately 7:00 p.m., Ronald Terry Kynard walked up to the front door of the Hannah residence and *Page 259 
knocked on the door. The defendant stated that he was carrying a cardboard box which he sat on the front porch. When Mrs. Hannah answered the door, the defendant stated [that] he had a delivery for her. When Mrs. Hannah opened the door and reached down for the box, Kynard stated that he stabbed her in the back with a pocketknife. Mr. Kynard stated that Mrs. Hannah fell backwards as he kicked her feet out from under her. Mr. Kynard then stated that he went out the front door and walked to the right side of this house where he picked up a brick and a piece of concrete, returned to the house, and beat Mrs. Hannah with the brick and the concrete. The defendant stated that Mrs. Hannah was not dead, and he then went back outside and got a larger, [approximately] thirty-pound piece of concrete and hit Mrs. Hannah across the forehead with this larger piece of concrete. Mr. Kynard again stated that Mrs. Hannah was still not dead, so he went into the kitchen where he found a yellow kitchen sponge which he wrapped around the handle of a large butcher knife found in the kitchen drawer. Mr. Kynard further admitted that he used the sponge so that he could 'catch a better grip on it' and stabbed Mrs. Hannah in the chest. The knife was still in Mrs. Hannah at the time that her body was found.
 "Mr. Kynard then admitted that he went into Mrs. Hannah's bedroom, where he took approximately $67.00 in cash together with the keys to Mrs. Hannah's 1986 Chevrolet automobile. Mr. Kynard also admitted taking approximately $150.00 which he found in a night stand drawer located next to Mrs. Hannah's bed.
 "The defendant further admitted to returning to the scene on Saturday, September 3, 1988, in the morning hours to see 'if she was till there.' Mr. Kynard stated that he just stood there in the living room and looked to see what 'I had did.'
 "At trial two (2) lay witnesses, Jerry Sawyer, and Bernard Billingsley, testified that they met the defendant in Marion on Friday evening, September 2, 1988. Both individuals admitted riding with Terry Kynard to Selma, Alabama, where they went briefly to the Businessman's Club, and returned to Marion that same night. Both individuals identified Ronald Terry Kynard as the driver of a light-colored vehicle, with Jerry Sawyer particularly identifying the car as the Chevrolet Celebrity.
 "Frank Danley and Alexander Jackson both testified that they rode to Greensboro, Alabama, on Sunday, September 4, 1988, with the defendant, Ronald Terry Kynard. Both individuals stated that they had ridden to Greensboro with Terry Kynard and Ludie Cole, and that Terry Kynard was driving a yellow-colored vehicle. Both Jackson and Danley identified the Hannah vehicle as the same vehicle that [Ronald] Terry Kynard was driving on Sunday, September 4, 1988.
 "Additional testimony was presented at trial wherein latent fingerprints of value, being the right ring finger, and right little finger of Ronald Terry Kynard, were identified as being on the inside of the front door of the Hannah residence. Mrs. Prevost further testified that another fingerprint, that being the left thumb print of Ronald Terry Kynard, was identified as being found on the bottom drawer of a (6) six-drawer dresser in the rear bedroom, that being the bedroom of Mrs. Emily Jordan Hannah.
 "Additional forensic testimony was presented wherein Dr. Warner, a forensic pathologist, stated that Mrs. Hannah died from multiple blunt force trauma to her face and chest. Testimony from other members of the Department of Forensic Sciences revealed that the approximately weight of the larger concrete slab was in excess of twenty-nine (29) pounds."
The appellant argues that the State used its peremptory challenges in a racially discriminatory fashion, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986), and Alabama law. The record indicates that, after the striking of the jury, defense counsel objected on this ground, stating that the prosecutor had used 11 of his 13 strikes to remove black persons from the venire, and that his first 6 strikes were used to remove blacks. Defense counsel *Page 260 
then made an offer of proof concerning prior patterns of documentary striking in the fourth judicial circuit. The State responded that it was prepared to give reasons for its strikes and the trial court then ordered the State to justify its strikes. The prosecutor gave the following reasons for his strikes:
 "[Prosecutor]: . . . . First, I'll say as an officer of this court, we did not strike based upon race. We did have the luxury of very extensive voir dire conducted by the Court. Our first strike was number 34 who was struck from this jury for the following reasons: one, he came to the bench and indicated he had a hardship. He said he didn't feel right or was uncomfortable about being on the jury. He wanted to get off. He said on individual voir dire that he didn't know anything about the facts of this case at all. He was disabled. It was thought that he had been accused of petty larceny in Marion. The most important reason was that he said during the voir dire that age does make a difference when considering the death penalty. That's our main reason for striking him.
 "Our second strike was number [13] [who] was struck for these reasons: one, he indicated that he knew the Defendant's father, Willie Kynard. He said the Defendant had been to his house with some of his own children. He knew the Defendant's mother and brothers and knew [a defense witness], and he had heard some comments about the case. Our main reason for striking [him] was his friendship with the Defendant, his family and his father.
 "Our next strike is number 26. . . . Our reason for striking [her] was the following, Judge: she has seen Dr. Hodo, who is a defense witness, and we expect that to be the heart of the Defendant's case. The insanity defense. [She] was a patient of Dr. Hodo's. She knew Mr. Howard, who was a defense witness, and she has a family member . . . [who] had been charged with a crime. She denied having an extensive record. She's unsure about her feelings on the death penalty and she also heard . . . from street talk that the Defendant did not commit this crime by himself. That's our reason for striking her.
 "Our next strike was number 18 . . . [We struck him] because [he] knows a witness named Eddie Benjamin. He went to school with Frank Danley . . . [a] State witness. Also, E.B., a homosexual, Your Honor. We expect that Mr. Benjamin was a roommate of this Defendant. Mr. Darby is a friend and associate of this Defendant. He knows Mr. Howard who is a Defense witness and I think he indicated he was a distant relation to Willie Hogue, a Defense witness. . . .
 "Our next strike was number 37 . . . [We struck her because] [s]he wanted to get off the jury and said she had a hardship. She didn't know anything about the facts of the case. Our most important reason for striking [her] was that she did indicate, as her husband [potential juror] indicated, that age does make a different [sic] when considering the death penalty. She led us to believe that she would be inclined in the case of a young defendant to not impose the death penalty. That's why we struck her.
 "[Defense counsel]: If I could just right at this point state that she was not questioned about the death penalty on voir dire.
 "[Prosecutor]: I'll continue. Our notes indicate that she did say that.
 "Our next strike was number 47. . . . Judge, she knew everybody in the case. She has a close association with the Defendant's family. She indicated that her father spent untold afternoons fishing with this Defendant's father. She knew his whole family. Because of her association with the Defendant and his family and close relationship, the fact that she taught school, she's a school teacher, we had some concern among ourselves that she would have some sort of maternal instinct for any of her previous students. That's why we struck her.
 "Our next strike was number 25, . . . a white male and we struck [him] because of an arrest, and that was our main reason.
 "Our next strike was number 27 . . . [We struck her] because she said she knew Mr. *Page 261 
Howard, a Defense witness. Most importantly, she was a patient of Dr. Hodo's. She wanted to be excused from the case to care for her relatives. She had a family member who had been charged with a crime and there were some questions whether we had [another potential juror or this potential juror], who initially raised their hands indicating some uncertainty about their feeling concerning the death penalty. Both of them denied that on voir dire, and that's why we struck them. Mainly, because she was a patient of Dr. Hodo's.
 "Our next strike was number 10 [and we struck her] because she's related mainly to, you know, but even though the spelling is different, she's related to 'Pete' C. from Uniontown. She knows Mr. Howard, the Defense witness and worked for him for a while. Those were our main reasons for striking her.
 "[Defense counsel]: Is the name 'Pete' C. supposed to mean something to us particularly?
 "[Prosecutor]: For the record, 'Pete' C. has been indicted for two counts of drug offenses.
 "THE COURT: That's the second case on this docket for trial.
"[Prosecutor]: That's why we struck her, Judge.
"THE COURT: It's not spelled the same though.
 "[Prosecutor]: It's C., but she's a relative of him [sic], according to Uniontown Police Office. Specifically, Officer Sammy Plummer. Mr. Gray contacted Officer Plummer and he relayed that information to us this morning.
 "Number 36 was my next strike. . . . We have, from talking to Uniontown Police Department and also to Perry County Deputy, Tommy Geter, there's been a lot of complaints about rowdy behavior coming from his household. Even though he's never been arrested, his brother has been. Also, he was similar [in] age, of these veniremembers, he was closest to [the] age to this Defendant, and we thought our best jury would be one who [sic] shouldn't have people of the same age. That's our basic reason for striking him. We didn't really know all that much about him. The record also shows that he was unemployed as well, Judge.
 "Our next strike was . . . a white male. We struck him for his arrest record.
 "Our next strike was number 49 [and we struck him because] [h]e indicated in voir dire that he knew Willie Kynard [the appellant's father] and Freeman Kynard [the appellant's brother]. He described himself as the other jurors did, being sentimental. He also has a child the Defendant's age and that was our basic reason for his strike. The main reason was [because he had] a child the Defendant's age.
 "Our next and last strike was number 8. . . . We struck her, the main reason for striking [her] was that she had indicated several things, Judge. The first being that she was not sure about her feelings towards the death penalty. Later in voir dire she firmed that up. But initially, she had indicated that she was unsure. The second reason was that her husband was an alcoholic. She said his name in front of the venire. She said she was an acquaintance of the Defense witness, Mr. Howard, but the main reason being was [sic] the uncertainty of her feelings towards the death penalty.
 "Those were our reasons for those strikes, Your Honor."
Thereafter, defense counsel argued that certain reasons given by the prosecutor were not proper and that they were merely pretext and sham. Following the prosecutor's explanations for his strikes, the following discussion took place:
 "[Defense Counsel]: Your Honor, I would like to point out for the record, there are other teachers, white teachers, a name comes to mind is Ms. T., who was not struck from the panel. I would like to also point out that Juror number 36 had been struck for, under the case, it might be termed a 'fanciful' reason. They talked to the police department and . . . the house that he lives in includes a rowdy brother and if that's not fanciful, nothing is. Also, they have struck him for reasons that have *Page 262 
nothing to do with — anything to do with the voir dire in this case. They knew his age before he got here, that he was nearly the age of the defendant. They knew his employment before he got here, that he was unemployed. They talked to the police and someone in the household in which he is thought to live may have been rowdy, is not a legitimate reason for striking this man. He was selected prior to the meeting of this venire or could have been so selected on the basis of this same criteria without even resorting to voir dire, to determine that he was black and due to be struck.
 "In further response, [the prosecutor] indicated that he would not use any of his National Crime Information Computer] material for striking and he refers to arrest records continually throughout his explanation to the Court. He indicated in one case that that is a primary consideration. He has in fact used these materials for striking . . . this jury.
". . .
 "MR. RUSSELL: The striking [of] juror number [37] was allegedly done simply because that person is a wife of another juror struck for a more legitimate reason. I'd like to point out that no white person was unsure of the death penalty other than juror number 25, who initially said he was unsure and then later recanted. He was struck from this panel simply for being unsure about the death penalty. All of the blacks [who] listed themselves as being unsure of the death penalty were struck by the district attorney's office in their peremptory strikes. Another thing is that there's been a continual stream of reference about certain persons being Hodo patients. That was not their testimony. The question you asked of them was, 'Have you or has anyone of your family ever been attended by Dr. Hodo, who may be a witness in this case?' If [the prosecutor] knows that these persons are Hodo patients, he doesn't know that from what they said in court. These are psychiatric records and they're privileged. There was no further inquiry made to determine whether these persons themselves were patients or whether an extended member of their family might be patients.
 "We also show the white witnesses of the venireperson F., and perhaps another one, as definitely indicating a relationship of some kind with Dr. Hodo. Those persons were left on the panel or were left on the panel for us to strike for other than valid reasons.
 "[Prosecutor]: May I interject at this time? Ms. F. was Defendant's sixth strike. I had planned on striking her myself because of the relationship with Dr. Hodo.
 "[Defense counsel]: And I also planned to be much taller than I am today too, but that didn't work out either. Also, Your Honor, there was some reference made to the fact that these people describe themselves as being sympathetic or affectionate persons. As I recall, the entire venire indicated that they were generally composed of sympathetic or affectionate persons. To list these among the reasons that blacks were struck from this panel is violative of the Batson ruling and the Jackson case. The prevailing reason for striking blacks from this jury would seem to be that they know witnesses, that they know facts of this case. All the people on this panel, save three, knew pretty extensively of the facts of this case. We've been required, against our objections, to try this case in a small town where everybody knows everybody. The witness list is very long and to allow their knowledge especially of State's witnesses and there were several referred to that simply knew State's witnesses, juror number 18 specifically knew State's witnesses, they're in control of their own subpoenas. They can make any prophesy, self-fulfilling, if they're allowed to simply say they know the people we've subpoenaed in this case for us. They would not appear to be against the interest of the State and it's not a rational basis for striking. Your Honor, in reference to the Batson case and the Jackson
case and the other Alabama cases that interpret these cases, we're also making reference at this time to my client's rights under the Amendments to the Constitution including Amendment Five, Six, Fourteen, and those sections of the Alabama Constitution *Page 263 
here of 1901 that speak to this and the ones I recall are One, Six and Fourteen, and I'm also informed that Batson raises certain Fourth Amendment Rights that we do want to waive at this time as well. Those are our objections.
"THE COURT: Anything further from the State?
"[Prosecutor]: No, sir.
 "THE COURT: The court finds the State has given race-neutral reasons for their strikes. The Batson motion will be denied."
In the present case, the trial court allowed the prosecutor to present his reasons for his strikes, without determining whether the defendant had made a prima facie showing of discrimination; this court therefore, must review the reasons for the prosecutor's strikes. McDaniel v. State, 611 So.2d 1164
(Ala.Cr.App. 1992), citing Huntley v. State, 627 So.2d 1013
(Ala. 1992); Hernandez v. New York, 500 U.S. 352,111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); United States v. Forbes,816 F.2d 1006 (5th Cir. 1987); McLeod v. State, 581 So.2d 1144
(Ala.Cr.App. 1990); Currin v. State, 535 So.2d 221
(Ala.Cr.App.), cert. denied, 535 So.2d 225 (Ala. 1988); Avery v.State, 545 So.2d 123 (Ala.Cr.App. 1988). "Initially, we note that the State's burden of rebutting a defendant's prima facie case of discrimination increases in proportion to the strength of the prima facie case. Ex parte Bird, 594 So.2d 676, 680
(Ala. 1991). "In determining ' "the propriety of the ultimate finding of discrimination vel non," ' Huntley v. State,627 So.2d 1013, 1016 (Ala. 1992), this is a significant (although not controlling) factor to consider." Newman v.State, Ms. CR-91-961, November 25, 1992), 1992 WL 345602 (Ala.Cr.App. 1992) (Bowen, J., dissenting), reversed, [Ms. 1920659, May 21, 1993] 1993 WL 167923 (Ala. 1993) (adopting Judge Bowen's dissent.)
The record reveals that in the present case the prosecutor used 11 of his 13 strikes (or 85% of his peremptory challenges) to remove blacks from the venire. Following excusals, the venire consisted of 37 prospective jurors, 13 of whom were black; thus black venire-members comprised 35% of the panel. However, only 2 blacks served on the jury; thus blacks comprised only 17% of the trial jury.
The record also indicates that, in his objecting to the prosecutor's strikes, defense counsel made a proffer of testimony concerning a prior pattern of discriminatory striking in the fourth judicial circuit against black potential jurors. Recently, this court has held clearly erroneous a trial court's finding that the prosecutor did not exercise his peremptory challenges in a discriminatory manner in a case originating in Dallas County, which is in the fourth judicial circuit.Duncan v. State, 612 So.2d 1304 (Ala.Cr.App. 1992). See alsoMarks v. State, 581 So.2d 1182, 1186-87 (Ala.Cr.App. 1990) (a Dallas County case where the trial court held that the prosecutor used one peremptory challenge in a discriminatory fashion and ordered that potential juror who had been struck placed back on the panel.) See also Ex parte Thomas,601 So.2d 56 (Ala. 1992) (a Dallas County case, in which the Alabama Supreme Court held that the trial court improperly accepted "at face value the State's ostensibly facially neutral explanations for the use of its peremptory challenges, which were, with regard to three of the black veniremembers who were struck, based exclusively on information contained in the document to which only the State had access." Id. at 58).
" 'The fact that the blacks struck include both men and women and that they were a variety of ages, occupations, and social or economic conditions, indicates that race may have been the deciding factor.' Harrell [v. State, 555 So.2d 263, 266
(Ala. 1989)]." Mitchell v. State, 579 So.2d 45, 48
(Ala.Cr.App. 1991), cert. denied, 596 So.2d 954 (Ala. 1992). See also Hemphill v. State, 610 So.2d 413, 415 (Ala.Cr.App. 1992) (the fact that the State excluded veniremembers. whose ages ranged from 20 to 63, and whose occupations varied indicated discriminatory intent.) In this case, of the 11 black persons struck by the prosecutor, 6 were black men and 5 were black women; 2 were in their twenties, 3 in their thirties, 1 in his forties, 3 in their fifties, 1 in her sixties; as to one juror, the record did not state a date of birth. In addition three blacks were widowers, six were married, and two were single; two blacks were *Page 264 
retired, six were employed, two were unemployed, and one was disabled. Furthermore, of the six employed blacks who were struck by the prosecutor, one worked on a farm, one was a foundry worker, one was a machine operator, one worked in maintenance, and one worked at the Family Dollar Store.
Because all of this evidence directly relates to the factors enunciated in Ex parte Branch, 526 So.2d 609, 622-23
(Ala. 1987), it is clear that a strong prima facie case of discrimination existed in this case.[1]
 " 'Although a prima facie case is always rebuttable, the existence of a number of suspicious factors requires a more cogent explanation and rebuttal. Consequently, the burden of production, which shifts to the State once a prima facie case has been presented, increases in proportion to the strength of the defendant's prima facie case. In other words, a "weak prima facie case may be rebutted more readily than a strong one." Gamble v. State, 257 Ga. 325, 357 S.E.2d 792, 795 (1987) (emphasis added).
 " 'In this case, the venire consisted of 52 prospective jurors. The 19 black venire-members comprised 36% of the venire. However, the fact that only one black juror was ultimately seated on the jury meant that blacks comprised only 8% of the trial jury. This fact alone reveals a disparate impact and immediately arouses suspicion of the existence of discriminatory intent. See [Ex parte Branch, 526 So.2d 609, 623 (Ala. 1987)]; see also Batson, 476 U.S. at 93, 106 S.Ct. at 1721. To be sure, the fact that a larger percentage of black venire-members eventually is seated on a jury raises less suspicion than if a smaller representation is seated and affords less support for a prima facie case of discrimination. See Batson, 476 U.S. at 101, 106 S.Ct. at 1726 (White, J., concurring) . . .; Note, Batson v. Kentucky and the Prosecutorial Peremptory Challenge: Arbitrary and Capricious Equal Protection, 74 Va. L.Rev. 811, 821-22 (1988). In fact, a large representation might afford the defendant no support at all and could even weaken his prima facie case should he be able to establish one on other grounds. See Harrell v. State, 571 So.2d 1270 (Ala. 1990) (on return to remand).' "
Ex parte Carter, 627 So.2d 1030 (Ala. 1993), quoting Ex parteBird, 594 So.2d at 680-81. (Emphasis original.)
"It is well settled that the ruling of the trial court on aBatson hearing is entitled to substantial deference and will not be disturbed on review unless it is 'clearly erroneous.'Scales v. State, 539 So.2d 1074 (Ala. 1988). However, the failure to articulate a sufficient race-neutral reason for excluding even a single black veniremember may entitle the defendant to a new trial. Harrell v. State, 555 So.2d 263
(Ala. 1989)." Ex parte Bankhead, 625 So.2d 1146, 1148
(Ala. 1993).
 " 'In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons . . . are true, the challenges violate the Equal Protection Clause as a matter of law. . . . At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation.' Hernandez v. New York, 500 U.S. 352, ___, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395
(1991). 'Once the prosecutor has articulated a nondiscriminatory reason for challenging the black jurors, the other side can offer evidence showing that the reasons or explanations are merely a sham or pretext.' [Branch, 526 So.2d] at 624 (citations omitted).
 " 'The trial judge cannot merely accept the specific reasons given by the prosecutor at face value, see [People v.] Hall, 35 Cal.3d [161,] 168, 672 P.2d [854,] 858-59, 197 Cal.Rptr. [71,] 75 [(1983)]; Slappy [v. State], 503 So.2d [350,] 356 [(Fla.Dist.Ct.App. 1987)]; the judge must consider whether the racially neutral explanations are contrived to avoid admitting acts of group discrimination. See Slappy, supra. This evaluation by the trial judge is necessary because it is *Page 265 
possible that an attorney, although not intentionally discriminating, may try to find reasons other than race to challenge a black juror, when race may be his primary factor in deciding to strike the juror.'
 "Id. at 624. See also Ex parte Thomas, 601 So.2d 56
(Ala. 1992) (reversing based on the trial court's accepting the state's reasons at face value). We may reverse the trial court's determination only if it is 'clearly erroneous.' 526 So.2d at 625. See also Hernandez v. New York."
Walker v. State, 611 So.2d 1133, 1139 (Ala.Cr.App. 1992).
" '[I]n reviewing allegations that the prosecutor exercised the state's peremptory strikes in a racially discriminatory manner, "the reviewing court's inquiry . . . shall not be restricted by the mutable and often overlapping boundaries inherent within a Batson-analysis framework, but, rather, shall focus solely upon the 'propriety of the ultimate finding of discrimination vel non.' " ' [Bui v. State, 627 So.2d 855, 859
(Ala. 1992)] (quoting Huntley v. State, 627 So.2d 1013
(Ala. 1992))." Newman v. State, 1992 WL 345602, *6.
In determining whether actual discrimination existed in the prosecutor's strikes, the trial court "cannot merely accept the specific reasons given by the prosecutor at face value," Exparte Thomas, 601 So.2d at 58, but must consider whether these reasons have in fact been contrived to cover up a racially motivated reason for a strike. Id. In this case, an evaluation of the reasons given by the prosecutor that appear in the record and the voir dire examination reveals a number of instances of disparate treatment of potential jurors in striking for certain stated reasons, a reliance on false or mistaken information, and the existence of reasons based on information outside the record that had not been referred to in voir dire questioning.[2]
The prosecutor cited as his "main" reason for striking juror number 34 that "he said during the voir dire that age does make a difference when considering the death penalty." However, the record indicates that when the trial court asked whether anyone believed that young people are less responsible than older people, no one responded. Thereafter, the trial court asked whether age "should make no difference" in determining guilt, and received two responses. The trial court repeated the question and received 27 responses; none of which was juror number 34. On appeal, the State argues that "the prosecutor apparently made a mistake in his notes as it does not appear that [this juror] affirmatively responded when asked whether young people of the defendant's age were less responsible than older people."
The prosecutor also gave as a reason for this strike that "[i]t was thought that [juror no. ___] had been accused of petty larceny in Marion" in 1967. The record indicates that the prosecutor had gained this information through an NCIC report, which was the subject of a motion by the defense, requesting that the defense be allowed equal access to the information contained in that report concerning potential jurors. Following argument on the motion, the State had assured the defense and the court that it would not use the information contained in that report for the purpose of determining which potential jurors to strike. The record further indicates that this potential juror was questioned concerning any involvement in this petty larceny, and the potential juror responded that he had never been in trouble with the law and that he had not been involved in any petty larceny. The record indicates that this potential juror would have been 16 at the time of the offense; when the trial court asked him whether he had been in trouble as a juvenile, the potential juror responded that he had not.
The prosecutor also gave as a reason for striking this potential juror that he had "indicated he had a hardship" and that he "didn't feel right or was uncomfortable about being *Page 266 
on the jury." The record indicates that this juror stated that "me and [my wife], we ain't never done this before. I don't feel comfortable doing it." This potential juror also stated that he had an 11-year-old child and that they had no one to take care of the child, because his wife was also on the venire. He also indicated that he had a hip problem, which made it hard for him to sit for long periods. The trial court told the potential juror that the court would take frequent breaks and that any time this potential juror needed to stop, it would do so. The potential juror again responded that he felt uncomfortable about serving on a jury. The appellant, however, notes that two white potential jurors who were not struck also indicated that they did not wish to serve — one of them noting that he owned a business that was being neglected by his having to be on the jury and that he had small children and no baby sitter, while the other stated that she did not wish to serve because she had a sister who had spent time in prison and four small children at home. Although she stated that she had a baby sitter and that her husband would be home while she served on the jury, she indicated that there would be periods while she was on the jury where no one would be watching the children.
Juror number 26 was struck because the prosecutor stated that she was a patient of Dr. Hodo, a defense witness, whose testimony the prosecutor expected to be the heart of the appellant's case. However, the record indicates that this witness stated that, although her father had been a patient of Dr. Hodo, she had never been a patient. The prosecutor also said that he struck number 26 because he knew "Mr. Howard, who was a defense witness." The appellant argues that no such defense witness existed and that the voir dire examination is devoid of any mention of a Mr. Howard as a witness. Upon review of the transcript, it is apparent that neither the trial court nor the parties ever mentioned Mr. Howard as a defense witness. However, James Howell was a defense witness, but while five potential jurors acknowledged knowing him, it is unlikely that the prosecutor was referring to this witness when he said "Mr. Howard," because those jurors were number 4, (struck for cause), number 13 (struck by prosecutor), number 28 (struck for cause), number 24 (served as alternate), and number 47[3] (struck by prosecutor). Those struck by the prosecutor because they knew Mr. Howard were jurors numbered 26, 18, 13, 10, and 8. Moreover, the appellant also notes that even if such a defense witness existed, two white jurors, who indicated that they were neighbors with, or that they knew, a defense witness, were not struck.
The prosecutor also gave as a reason for striking this potential juror that the juror denied having "an extensive record." The prosecutor is referring to an individual with the same name as juror number 26, whose name is shown in the NCIC report as having been involved in numerous counts of prostitution in New York and California. The potential juror was questioned about these charges, and stated that she had not been involved in such offenses and that she had always lived in Marion, Alabama. In fact, during voir dire questioning, this potential juror was among the individuals who responded that they considered themselves to be life-long residents of Perry County.
The prosecutor also gave as a reason for striking this potential juror the fact that she was unsure about her feelings concerning the death penalty. However, during the individual voir dire questioning, the following transpired:
 "THE COURT: [Potential juror], I note on my list that you had indicated you were either not sure or were firmly opposed to the imposition of the death penalty. Was that you?
"[Potential juror]: No.
"THE COURT: You didn't say anything about that?
"[Potential juror]: No.
"THE COURT: All right. Further from anybody?"
The prosecutor also gave as a reason that the potential juror had heard from "street *Page 267 
talk" that the defendant did not commit this crime alone. The record indicates that when this potential juror made that statement, the trial court instructed the juror that, if she were chosen, it would be her job to listen to the evidence, to follow the law, and to arrive at a decision without regard to anything she had heard on the streets or had read in the paper. The potential juror responded that she could follow these instructions and that she would base her decision solely on what transpired in the courtroom.
Juror number 18 was struck because he knew a defense witness named Eddie Benjamin. The record indicates that two other potential jurors also indicated that they knew this witness, and that one of them was struck for cause and the other was struck by the appellant. The prosecutor also stated as a reason for striking this potential juror that he indicated that he had gone to school with one of the State's witnesses. The prosecutor also stated that the potential juror knew an E.B., who the prosecution said was a homosexual. It is unclear how this characteristic would affect a juror's decision in this case. The prosecutor also indicated that this potential juror knew Mr. Howard, the alleged defense witness whose name never appears in the record. The prosecutor also stated that the potential juror indicated that he was a distant relative of another defense witness.
Juror number 37, the wife of juror number 34, was also struck by the State. The prosecutor stated that his reasons for striking her included the fact that she indicated that she wanted to "get off the jury," although the record indicates that two white jurors, who were not struck, also had made that complaint. The prosecutor also gave as a reason that "[s]he didn't know anything about the facts of the case."[4] The prosecutor then cited the most important reason for striking the potential juror was that she indicated "that age makes a different [sic] when considering the death penalty. She led us to believe that she would be inclined in the case of a young defendant to not impose the death penalty." However, the record indicates that she did not respond to the question on voir dire as to whether she believed that young people were less responsible.
Juror number 47 was struck by the State because, it said, "she knew everybody in the case." The record indicates that this potential juror did indicate that she knew most of the witnesses for both parties. The prosecutor further stated that "the fact that she taught school, she's a school teacher, we had some concern among ourselves that she would have some sort of maternal instinct for any of her previous students." However, the record indicates that this witness indicated that she had taught certain of the State's witnesses and family members of the prosecutor, as well as defense witnesses. Moreover, as noted by the appellant, a white female, who served on the appellant's jury, was also a school teacher.
Juror number 13 was struck by the prosecutor because he indicated that he knew the appellant's father, as well as the appellant's mother and brothers. He also indicated that the appellant had been to his house. The prosecutor also stated that the potential juror indicated that he knew "Mr. Howard," the defense witness. He also stated that he struck this juror because he had heard comments about the case, which is opposite from the reason the prosecutor gave for striking juror number 37, i.e., that she did not know anything about the facts of the case. Moreover, 9 of the 10 white jurors who served on the jury had indicated on voir dire that they had heard comments concerning this case.
Juror number 27, who was a sister of juror number 26, was struck "mainly" because the prosecutor said she was a patient of Dr. Hodo. But, as previously stated, this potential juror indicated that she was not a patient of Dr. Hodo's, but that her father had been a patient of his. The prosecutor further struck this potential juror because he said he was not sure whether she or her sister had indicated uncertainty towards the death penalty, but he acknowledged that both of them denied any uncertainty on individual voir dire questioning. He also indicated that he struck this potential juror because she asked to be excused to care for her relatives and *Page 268 
because she had a family member who had been charged with a crime. Another potential juror, who was a white female, also indicated that she had a family member who had been charged with a crime, but she was struck by the defense with their sixth strike.
Potential juror number 10 was struck "because she's related to, you know, but even though the spelling is different, she's related to 'Pete' C. from Uniontown." Upon further questioning concerning the difference in the spellings of the two names, the prosecutor stated that Officer Plummer of the Uniontown Police Department had informed the prosecution of the relation that morning. The prosecutor further explained that Pete C. had been indicted for two counts of drug offenses. The record indicates that the prosecutor never questioned this potential juror about whether any relationship existed. Moreover, this potential juror did not respond on voir dire questioning when the panel was asked whether any members of the venire had any family members who had been charged with a crime or who had been arrested. The prosecutor also gave as a reason for striking this potential juror the fact that this potential juror not only knew "Mr. Howard," the defense witness, but that she had worked for him for a while.
Juror number 36 was struck because the prosecutor stated that he had information from the Uniontown Police Department and Perry County Deputy Tommy Geter that a number of complaints about "rowdy behavior" in this potential juror's household had been received. The prosecutor acknowledged that "even though [the potential juror's] never been arrested, his brother has been." The prosecutor never questioned this potential juror about any "rowdy behavior" or whether he had a brother who had been arrested. The record indicates that this potential juror did not respond when the panel was asked whether any potential jurors had any family members who had ever been charged with a crime or arrested. The prosecutor also said that he struck this potential juror because "of these veniremembers, he was closest to the age of this Defendant." Juror number 36 was 28 years old. However, the record indicates that two white jury members, one age 23 and one age 25, were closer in age to Terry Kynard, who was age 20 at the time of trial, than this potential black juror. The prosecutor then stated generally of this potential juror, "[w]e didn't really know that much about him. The record also shows that he was unemployed as well, Judge."
Juror number 49 was struck because he indicated that he knew the appellant's father and his brother. The record indicates that 14 potential jurors, including the one at issue, responded that they knew either the appellant or a member of his immediate family. Two of these individuals who so responded were white and served on the appellant's jury. Two white jurors responded that they knew the appellant's father and three white jurors indicated that they knew the appellant's brothers; one of these white jurors knew them both. The prosecutor also gave as a reason for this strike the fact that this potential juror "described himself as the other jurors did, being sentimental." However, the record indicates that 15 potential jurors, including four white persons who sat on the appellant's jury, described themselves as "sentimental"; however, this potential juror was not among those so responding. The prosecutor also gave for his "main reason" for having struck this potential juror the fact that he had a child the appellant's age. However, the record indicates that a white potential juror who was not struck and who ultimately sat on the jury also responded that she had a child this age.
The prosecutor's reason for striking juror number 8 was based on the potential juror's expressed uncertainty about the death penalty, the fact that "her husband was an alcoholic," and the fact that "she was an acquaintance of the defense witness, Mr. Howard."[5] As to this potential juror's feelings toward *Page 269 
the death penalty, however, the record indicates that when this potential juror was questioned on individual voir dire, he stated that he could vote to impose the death penalty. A white female juror had also initially indicated her uncertainty about the death penalty, but also indicated on individual questioning that she could impose the death penalty. The prosecutor cited the reason concerning the uncertainty of his feeling toward the death penalty as his "main reason" for striking this juror. However, he also indicated that this juror was an acquaintance of "Mr. Howard," the defense witness who fails to appear in the record. He also gives as a reason the fact that this potential juror's spouse was an alcoholic. The record indicates that this potential juror did state that, "My wife was an alcoholic . . . [a]nd she's dead and gone." A white potential juror also indicated that her son was an alcoholic, but this potential juror was struck by the appellant.
We begin by noting that a number of the reasons given by the prosecutor were, at least facially, extremely suspect. Ex parteBird, 594 So.2d 676, 682-83 (Ala. 1991). This is so especially in light of the strong prima facie case of purposeful discrimination which exists under these facts. Certain of the reasons given by the prosecutor, such as age, unemployment, and occupation, are all "highly suspect" categories. See, e.g., Exparte Carter, 627 So.2d 1030, 1031 n. 1 (Ala. 1993), (Alabama Supreme Court quoted Ex parte Bird, 594 So.2d at 683 for the proposition that a " 'summary declaration that age was a factor in the decision to strike is . . . constitutionally deficient and warrants reversal' ").
The propriety of constitutionally challenged strikes is best analyzed by looking at the prosecutor's voir dire questioning directed to the stated reason, and looking to determine whether there was any disparate treatment in using these reasons to strike only a single race. See Hart v. State, 612 So.2d 520
(Ala.Cr.App. 1991), affirmed, 612 So.2d 536 (Ala. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993) (a strike based on unemployment was found to be race-neutral because this reason was used equally to remove black and white venire-members); Duncan v. State, 612 So.2d 1304, 1309
(Ala.Cr.App. 1992).
 "In Williams v. State, 548 So.2d 501
(Ala.Cr.App. 1988), this court stated that, where veniremembers are struck based on their association with a group, from which the prosecutor infers a bias, examination by the prosecutor during voir dire should establish that such a bias in fact exists. 'That these persons were challenged without being examined on voir dire in reference to any possible bias that they may have . . . raises a strong inference that they were excluded on the basis of race alone.' ")
Id. See also Carter v. State, 603 So.2d 1137, 1139
(Ala.Cr.App. 1992) (" '[B]lack jurors who were challenged without being examined on voir dire in reference to possible bias because of their employment, position in society, age, and residence raises a strong inference that they were excluded on the basis of race alone.' Williams, 548 So.2d at 508.")
"In Bird, the Alabama Supreme Court held that 'the failure of the State to engage in any meaningful voir dire on a subject of alleged concern is evidence that the explanation is a sham and a pretext for discrimination.' " Walker v. State,611 So.2d 1133, 1139 (Ala.Cr.App. 1992). In the present case, although the prosecutor refers to the "luxury" of an extensive voir dire by the trial court, the voir dire as to the stated reasons for the prosecutor's strikes varied from limited to nonexistent, and in several instances the juror's responses directly contradict these reasons.
 "[T]he prosecutor asked no follow-up questions associated with [his] reasons for exercising [his] peremptory strikes. Here, there was 'a lack of questions to the challenged juror, or lack of meaningful questions.' Ex parte Branch, 526 So.2d 609, 624 (Ala. 1987). See also Jackson v. State, 557 So.2d 855, 856 (Ala.Cr.App. 1990). 'The prosecutor did not specifically question any of the five blacks he struck and did not ask any question on voir dire relating to the explanation he gave for his strikes of any black veniremember.')"
Mitchell v. State, 579 So.2d 45, 47 (Ala.Cr.App. 1991), cert. denied, 596 So.2d 954 (Ala. *Page 270 
1992) (despite lack of meaningful voir dire, because there was no evidence of disparate treatment or disparate examination, the trial court's finding was not clearly erroneous.)
However, in the present case, there is abundant evidence of disparate treatment by the prosecutor in exercising of strikes, as indicated in our analysis of the reasons given each strike. "[A]ction in which non-black jurors have been challenged for the same or similar characteristics as black jurors who are struck has been deemed to be indicative of neutrality and is evidence which tends to overcome the assumption of discrimination." Ward v. State, 539 So.2d 407, 408
(Ala.Cr.App. 1988). It is clear that "disparate treatment furnishes strong evidence of discriminatory intent." Ex parteBird, 594 So.2d at 681. See also Christianson v. State,601 So.2d 512, 515 (Ala.Cr.App. 1992) (citing cases with parenthetical instances of evidence of nondisparate treatment in exercising strikes that was sufficient to overcome the presumption of discrimination). In Christianson v. State,601 So.2d 512, 515 (Ala.Cr.App. 1992), this court held that the reasons of unemployment, age, and single marital status given for strikes were all highly suspect. However, in that case, any showing of racial discrimination was defeated by the fact that there was "no claim or evidence of disparate treatment, and there is evidence that the prosecutor struck every veniremember who was 'unemployed, or watched soap operas regardless of race, unless there was a reason not to.' " See also Adkins v. State, [Ms. 7 Div. 146, March 5, 1993], 1993 WL 56209 (Ala.Cr.App. 1993) (Bowen, J., dissenting). "Here, the trial court had 'nothing on which to make the required "sincere and reasonable effort to evaluate the evidence and explanations based on the circumstances as [it knew] them." ' Bird, 594 So.2d at 683 (quoting Branch, 526 So.2d at 624)." Walker v.State, 611 So.2d 1133, 1140 (Ala.Cr.App. 1992). Cf. Adkins, (the trial court "went to great lengths to determine where the prosecutor had gotten his information" and "the record reflected" that all the notes made by the prosecutor during the voir dire selection were received into evidence at the Batson
hearing and were available to defense counsel"). This court held that "[w]e do not have a situation here where the trial court took at face value the reasons given by the prosecutor.Thomas, 601 So.2d 56 (Ala. 1992).")
Moreover, as indicated above, several reasons given by the prosecutor were directly contradicted by the record.
 "An explanation that is refuted, or not borne out, by the juror's statements on voir dire is insufficient to overcome the presumption of racial discrimination. Ex parte Yelder, 630 So.2d 107, 110
(Ala.Cr.App. 1992) (prosecutor's explanation that he struck veniremember because he 'couldn't understand a word she said,' [due to] 'the way she put her sentences together' was belied by the veniremember's actual responses on voir dire); Jackson v. State, 594 So.2d 1289, 1293-94
(Ala.Cr.App. 1991) (prosecutor's explanation that the veniremember was struck 'because "it was shown through voir dire that she was acquainted with and lived close to an individual" ' that the State was attempting to extradite, was discredited by record of voir dire that showed that the veniremember knew the individual 'only minimally and that her acquaintanceship with him occurred a number of years previous to th[e] trial.')"
Adkins, at *4 (Ala.Cr.App. 1993) (Bowen, J., dissenting).
In the present case, under these circumstances, the prosecutor's striking of juror 49 was improper and a number of other strikes, including jurors 37, 47, and 8, were highly suspect. "Because the State did not rebut [the appellant's] prima facie showing of racially discriminatory jury strikes, the judgment must be reversed under the principles ofBatson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, and its progeny." Ex parte Bankhead, supra, at 1148. Therefore, the judgment is reversed and the cause remanded to the trial court.
REVERSED AND REMANDED.
All Judges concur.
[1] Certain other factors enunciated in Ex parte Branch that raise an inference of discrimination, specifically disparate treatment of members of the jury venire and the type of questioning by the prosecution as it relates to its reasons for striking, will be discussed infra as these factors relate to the specific reasons given by the prosecution in this case.
[2] It should be noted that in the present case the trial court determined to undertake the voir dire questioning of the jury panel, allowing the parties to submit requested questions. However, the trial court ultimately allowed individual follow-up questioning of potential jurors on two grounds — pretrial publicity and the jurors' feelings toward the death penalty. However, the record reveals that the trial court was lenient in allowing the parties to question these potential jurors on other grounds.
[3] In fact, juror number 47 referred to James Howard, rather than James Howell, in response to the trial court's question as to whether any of the potential jurors knew James Howell.
[4] The record indicates that the prosecutor gave as a reason for striking potential juror number 13 the fact that "he heard some comments about the case."
[5] The appellant points out that the prosecutor, in giving his reasons for this strike, referred to this potential juror as a female, however the record indicates that this potential juror was in fact male. *Page 271