[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 578 
 On Return to Remand
Finding on original submission that the record in the instant case presented a prima facie case of purposeful discrimination by the state in the exercise of its peremptory jury challenges, we remanded this case to the trial court for the state to present its reasons for its peremptory strikes of black prospective jurors, as required by Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Ex parte Branch,526 So.2d 609 (Ala. 1987). Freeman v. State, 651 So.2d 573
(Ala.Cr.App. 1992). We instructed the trial court to evaluate these reasons in accordance with the principles established inEx parte Branch, and to make due return to this court of the proceedings below, including the court's specific findings of fact. The trial court has complied with our remand by conducting an evidentiary hearing at which the state was afforded an opportunity to provide reasons for its peremptory strikes and by filing its return, which includes a transcript of the proceedings below and its order setting out its findings of fact and conclusions of law.
The appellant, David Freeman, is white. As we recognized in our original opinion, a defendant in a criminal case has standing to request a Batson hearing whenever the state has exercised peremptory challenges so as to exclude members of a distinct racial group regardless of whether the defendant is a member of that distinct group. Powers v. Ohio, 499 U.S. 400,111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); Ex parte Bird,594 So.2d 676 (Ala. 1991); U.S. Const. amend. VI and XIV; Ala. Const. art. I, § 6. Thus, the appellant has standing to contest the state's use of peremptory strikes to eliminate blacks from his trial jury.
The trial of this case began on August 14, 1989, and after voir dire examination of the prospective jurors, conducted by the trial court, with the assistance of questions submitted by the parties, a jury was selected and empaneled. Eleven veniremembers, 5 of whom were black, were either excused or successfully challenged for cause, leaving a venire of 48 persons for selection purposes. Each side exercised 18 peremptory strikes. By agreement, the veniremember who was the object of the last strike of each party served as an alternate juror. Although there appears to be some confusion as to whether there were 10 or 11 blacks on the venire, we think the record supports the appellant's conclusion that there were 10. The state used 9 of its 18 strikes to remove blacks. The appellant struck 1 black. All the blacks in the venire were eliminated by peremptory strikes; therefore, the jury that tried this case was all white.
The record discloses that the district attorney[1] exercised the peremptory strikes for the state with the assistance of his deputy. In the remand hearing held on January 27, 1993, the district attorney testified, under oath, that no one had been able to locate his trial notes relating to information about the veniremembers and his reasons for his peremptory strikes. He stated that he did not intentionally lose or destroy his notes. He further testified that he struck this jury several years before the hearing and that, at the time, he had no reason to believe that he would later be called upon to give his reasons for those strikes. He explained that he relied on the contemporaneous notes of his deputy district attorney to "reconstruct the striking of a general nature of the jury," and to gain "some understanding as to why the jurors were struck in the fashion that [they were]." *Page 579 
The district attorney candidly admitted at the remand hearing that he did not know every reason for striking the veniremembers, but he did claim to have "the general overview of how we wanted the jury struck." He then testified about the general characteristics that the state was seeking to avoid in the jurors, and he attempted to relate those characteristics to the facts of the case. He first explained that, because he anticipated that there would be testimony from psychiatric experts and because the appellant's sole defense was insanity, "[o]ne of the things we wanted particularly in voir dire and wanted to know particularly was what experience did each juror have with psychiatrists, insanity defense, mental problems — were they recovering from previous bouts of insanity, or something like that." In giving his reasons for having on his strike list a particular veniremember who was eventually struck by the defense and also his reasons for not striking another veniremember who served on the jury, he further explained his reasoning:
 "Well, the way this case was tried and what I try to do from the outset was totally debunk insanity as a defense and to bring in — basically take the position in the jury that there is no way that any psychiatrist or psychologist can go back into a point of time and testify to a person's mental state. . . .
". . . .
 ". . . I was trying, first, to get people who had interaction with psychiatrists; secondly, those who had psychologists testify; thirdly, those who are kind of down the scale from those, all the way down. . . . [For example, t]he fact that someone went from their family to get counseling on how to deal with Alzheimer's disease or their parents as ranked against someone who had been treated by a psychiatrist for manic disorder, it just doesn't — the steam whistle on the boiler doesn't go off."
He also explained that another important concern was that the prosecution "certainly did not want a juror to serve that had an abiding feeling that they could not support the death penalty called for by the facts on religious or other grounds." A third area of concern, he stated, was that because "the nature of the offense itself was a serial killing of two women in a sexual nature[, the prosecution] certainly wanted anyone who had any kind of record of sexual abuse or involvement as a defendant or possible suspect or defendant in those kinds of cases . . . struck from the jury." He also noted that the prosecution generally tries to strike veniremembers involved in prison ministries. He pointed out that the defense's pattern of striking affected the state's strikes, stating that the defense struck veniremembers who the state would otherwise have struck. In recognizing that he had more veniremembers on his strike list than he had strikes, he explained that he used a "plus and minus" system in striking. He testified that he would not have struck black veniremember J.D., who was the only black struck by the defense.
After the district attorney explained his probable reasons for striking the veniremembers, the appellant offered no evidence to refute those reasons or to show that they were a sham or pretext. The trial court expressed frustration with the fact that the appellant's cross-examination of the district attorney did not extend beyond a superficial examination about the notes used by the district attorney to refresh his recollection. Rather than relying upon rebuttal evidence, the appellant argued that the trial court should not accept the district attorney's reasons because, he argued, they were not race-neutral and because, he asserted, it was apparent from the district attorney's testimony that the reasons he gave at the hearing for striking veniremembers had been reconstructed from the notes of his deputy and from other material and thus were not his actual reasons for striking. He further pointed out that the district attorney failed to give any reason whatsoever for the striking of several of the black veniremembers and as to those veniremembers offered only a plea of good faith; that characteristics offered by the district attorney for justifying his strikes against blacks were shared by some whites who served on the jury; that some of his reasons for striking black veniremembers were group-based without any indication that those veniremembers shared the characteristics associated with that group; and that the *Page 580 
Montgomery District Attorney's office has a history of discrimination in the selection of jurors.
The defense also introduced two exhibits. Exhibit 1 consisted of typewritten notes prepared by the staff of the attorney general's office and used by the district attorney, in testifying, to refresh his recollection of the reasons for his strikes. Most of the information offered in these notes is annotated with the page number of the transcript of the voir dire proceedings where that particular information can be found. Exhibit 2 consisted of the computer-generated information sheets on each potential juror, all dated August 14, 1989. On most of these sheets are handwritten notes of the deputy allegedly made at the time of trial and/or the notes that she had available to her. The remaining handwritten notes reflect all information pertaining to each veniremember that was disclosed in the voir dire questioning. These notes are accompanied by the page number of the trial transcript on which the noted information can be found. We consider it reasonable to assume that these notes were added to Exhibit 2 after our remand opinion. The notes on the computer-generated pages were not used by the district attorney during his testimony, but were one of the bases for making the typewritten notes constituting Exhibit 1.
After the evidentiary hearing, the trial court made its findings of fact and conclusions of law, as follows:
 "This cause having come before the Court on remand from the Court of Criminal Appeals for this Court to conduct a factual inquiry into the jury selection process, the Court having held a hearing and taken testimony in this matter, the following findings of fact and conclusions of law are made:
 "1. The Court of Criminal Appeals has cited in its opinion dated September 18, 1992, general factual determinations as to the number of peremptory challenges utilized by the State and Defense, the number of strikes used to eliminate black venire members, and other employment characteristics that were exhibited by some of the venire members during the voir dire examination.
 "2. The Trial Court notes that it was not the undersigned who presided over the original trial in this case.
 "3. After a lengthy hearing, the State put forth evidence as to the order and utilization of its peremptory challenges.
 "4. The Trial Court has considered each of the reasons in light of the respective races of each of the State's strikes.
 "5. The uncontroverted evidence reveals the following:
 "a. The State's third strike was a black male named [O.C.]. Reasons set forth include that on voir dire examination, the venire member suggested weak support for the death penalty, a brother having been treated for schizophrenia, and that the venire member was unsuccessfully challenged for cause based upon his death penalty beliefs.
 "b. The State's sixth strike was a black female named [M.McB.]. The evidence is that this individual had prior convictions for discharging a firearm, destruction of private property, carrying a concealed weapon, and negotiating a worthless instrument.
 "c. The State's ninth strike was a black female named [A.H.]. This venire member had a 1979 conviction for possession of marijuana and other traffic violations within one year of the trial of this matter.
 "d. The State's tenth strike was a black female named [T.P.]. The reasons for the elimination of this juror could not be recalled; however, the uncontroverted testimony was that the elimination of this venire member was not racially motivated.
 "e. The State's eleventh strike was a black female named [M.M.]. This venire member had minor traffic violations within the last 5 years, had attempted suicide by overdose of drugs, and had visited a psychiatrist sometime prior to the trial of this case.
 "f. The State's twelfth strike was a black female named [B.H.]. The testimony *Page 581 
revealed the State could not recall the reasons for the elimination of this venire member other than it was not racially motivated.
 "g. The State's thirteenth strike was a black male named [H.P.]. The testimony revealed this venire member had convictions for larceny, theft of property, theft of property, and theft of property.
 "h. The State's fourteenth strike was a black male named [O.J.]. This venire member had 3 prior convictions for traffic violations. The testimony further revealed that this individual was employed at Brockway Glass where an investigation into numerous criminal activities was being conducted by the District Attorney's office. It was uncertain as to whether this individual had been a witness or had been questioned at any time during the investigation conducted by the District Attorney's Office.
 "i. The State's fifteenth strike was a black male named [W.B.]. The only evidence offered on behalf of the State was the age of this individual [72 years] and the fact that he was single. No other personal recollections were offered as to the reasons for the elimination of this venire member.
 "6. This Court further took testimony from the prosecutor as to the general characteristics which were being sought in the final makeup of the jury and the plus and minus system used in rating prospective jurors in this case.
 "7. These general characteristics were specific to the case of State v. David Freeman.
 "8. Issues involved in this case included the insanity defense and the pursuit by prosecutors of the death penalty based upon the facts of the case.
 "9. The Court concludes that personal views on imposition of death penalty held by venire members is a racially neutral reason for the elimination of jurors.
 "10. The Court further concludes that convictions for offenses is also a legitimate racially neutral reason for the elimination of venire members.
 "11. The Court further concludes that venire members' contact [with] or special knowledge related to counseling, psychiatry, psychology, or similar issues are racially neutral reasons for the elimination of venire members based upon the insanity defense being offered in the present case.
 "12. The Court determines that these criteria plus others articulated with specificity within the record are racially neutral reasons for the elimination of certain venire members, and that these criteria were applied consistently in the selection of the jury.
 "13. With respect to venire members [T.P.], [B.H.], and [W.B.], the State is able to offer limited explanation for the elimination of these venire members.
 "14. The Trial Court is troubled that all three of these jurors are black; however, there is no evidence to suggest these venire members were excluded other than for race neutral reasons. The victims in this case are white and the Defendant is white. There is no evidence that this crime was racially motivated or racially related.
 "15. The Trial Court notes that the Defense was given an opportunity, but declined to cross-examine the State's witnesses and further offer evidence in support of [its] claim.
 "16. Based upon the totality of the circumstances outlined by the State that were utilized in the selection of the jury, together with the review of the most recent appellate cases involving the jury selection process, the Trial Court concludes the State utilized its peremptory challenges in a nonracially motivated fashion."
(Return to Remand, R. 9-12.)
In reviewing this ruling, we are mindful of our standard of review, as expressed in the following:
 "The trial court's ruling on a Batson motion will be reversed only if clearly erroneous. Nance v. State, 598 So.2d 30, 31 (Ala.Cr.App. 1992); Jackson v. State, 594 So.2d 1289, 1294 (Ala.Cr.App. 1991). 'It is well settled that the ruling of the trial court on a Batson hearing is entitled to substantial deference and will not be disturbed *Page 582 
on review unless it is "clearly erroneous." ' Ex parte Bankhead, 625 So.2d 1146 (Ala. 1993). In Ex parte Branch, 526 So.2d 609, 625-26 (Ala. 1987), the Alabama Supreme Court approved the use of a 'clearly erroneous' [standard] for reviewing the factual findings by the trial court in Batson
proceedings. In Bui v. State, 627 So.2d 855 (Ala. 1992), the Alabama Supreme Court said, ' "the reviewing court's inquiry . . . shall not be restricted by the mutable and often overlapping boundaries inherent within a Batson-analysis framework, but, rather, shall focus solely upon the propriety of the ultimate finding of discrimination vel non." ' Bui v. State, citing Huntley v. State, 627 So.2d 1013 (Ala. 1992)."
Merriweather v. State, 629 So.2d 77, 88 (Ala.Cr.App. 1993). The United States Supreme Court, in Hernandez v. New York,500 U.S. 352, 364, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395 (1991), explained the rationale for this standard of review, as follows:
 "Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will 'largely turn on evaluation of credibility.' 476 U.S., at 98, n. 21, 106 S.Ct., at 1724, n. 21. In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 854 [83 L.Ed.2d 841], . . . (1985), citing Patton v. Yount, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892 [81 L.Ed.2d 847] . . . (1984)."
"The burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination." Ex parte Bird, 594 So.2d at 679 (quoting Ex parte Branch, 526 So.2d at 622). "In determining whether there is a prima facie case, the court is to consider 'all relevant circumstances' which could lead to an inference of discrimination." Ex parte Branch, 526 So.2d at 622 (quoting Batson, 476 U.S. at 96-97, 106 S.Ct. at 1722-1723). On original submission of this death penalty case, we found, under the plain error standard of review, A.R.App.P. 45A, that "[t]he instant record is clearly sufficient to show that a prima facie case of purposeful discrimination could be made by the appellant." Freeman, 651 So.2d at 575. We based this finding on the state's use of peremptory strikes to remove 9 of the 10 blacks[2] on the venire, and upon the following relevant considerations:
 "The prosecutor not only exhibited '[a] pattern of strikes against black jurors on the particular venire,' Ex parte Branch, 526 So.2d 609, 623 (Ala. 1987), but '[t]he state used peremptory challenges to dismiss all or most black jurors,' id.
Furthermore, we consider that the voir dire offers overwhelming evidence that 'the "jurors in question share[d] only this one characteristic — their membership in the group — and that in all other respects they [were] as heterogeneous as the community as a whole," ' id. at 622 (quoting People v. Wheeler, 22 Cal.3d 258, 280, 148 Cal.Rptr. 890, 905, 583 P.2d 748, 764 (1978)). The record shows that of the 9 black veniremembers struck, 4 are males and 5 are females; 1 is a student, 1 is retired, and the other 7 are employed; 5 are married, 1 is widowed, and the other 3 appeared to be single; and 5 have children — 2 with children the same age as the younger victim and all with children between 10 to 19 years of age. Voir dire questioning also elicited that one is a former deputy sheriff, that one is a scout leader and has a daughter who has been sexually abused, and that several own guns and have friends in the police department. Moreover, we cannot ignore '[t]he past conduct of the state's attorney in using peremptory challenges to strike all blacks from the jury venire,' id. *Page 583 
In Ex parte Bird, 594 So.2d 676, 681 (Ala. 1991), the Alabama Supreme Court recognized 'what appears to be a pattern in the use of peremptory strikes by the Montgomery County District Attorney's office.' See also Ex parte Yelder, 630 So.2d 107 (Ala. 1992), cert. denied, [___] U.S. [___], 114 S.Ct. 1336, [127 L.Ed.2d 684] (1994); Bui v. State, 627 So.2d 849 (Ala.Cr.App. 1992).[3] Finally, we note that the prosecutor would have had enough remaining strikes to eliminate the other . . . black had defense counsel not struck [him] first, because after striking the 9 blacks, the prosecutor had 3 strikes remaining. We consider these factors to be sufficient to place on the prosecution 'the burden of articulating a clear, specific, and legitimate reason for [each] challenge which related to the particular case to be tried, and which is nondiscriminatory,' Branch, 526 So.2d at 623 (emphasis in original)."
Freeman, 651 So.2d at 575.
In its brief, the state asks us to reconsider several of the above factors. First, it argues that the district attorney's strike pattern does not provide evidence supporting a strong prima facie case of racial discrimination because "[c]learly, if the State had wanted to get rid of all the blacks for a racially motivated reason it would have struck all the blacks first." It is true that the state's strike pattern was as follows: two whites, one black, two whites, one black, two whites, seven blacks (with none remaining), and three whites, with the last strike being designated as an alternate. However, if we were to accept the state's argument, we would be, in essence, holding that only the prosecutor's use of his first strikes to eliminate all the blacks is evidence of discriminatory intent. Obviously, we must reject such a notion.
Rather, a closer look at the record in this case reveals a definite pattern — a pattern that "implies that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," Hernandez,500 U.S. at 360, 111 S.Ct. at 1866 (quoting Personnel Administratorof Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282,2296, 60 L.Ed.2d 870 (1979)) (footnote and citation omitted inHernandez). The district attorney described his strikes as follows: his first strike was a white male who opposed the death penalty and was awaiting trial for sexual abuse; the second was a white male whose son had been prosecuted by the district attorney for a sex crime, whose son had been under psychiatric treatment, and whose son had either committed suicide or was in prison; the third was a black male who was weak on the death penalty and whose brother was schizophrenic; the fourth was a white female who was against the death penalty and had a spotlighting conviction; the fifth was a white male who was against the death penalty and who was taking prescribed medication for a mood disorder; the sixth was a black female who had prior convictions for discharging a firearm, for destruction of private property, for carrying a concealed weapon, and for negotiating a worthless instrument; the seventh was a white male who was involved in prison ministry, who had a misdemeanor conviction for possession of marijuana, and who had consulted a psychiatrist; and the eighth was a white female who was involved in prison ministry and whose sister-in-law had been under psychiatric care. In our survey of those veniremembers who had been eliminated by the defense at this point and the remaining veniremembers, it appears that, after the district attorney struck the veniremember whose prosecution for sexual abuse was pending in his circuit and the veniremember whose son he had prosecuted for a sex offense, his intent was to eliminate all those who disfavored or expressed views against the death penalty, which he did by his third, fourth, and fifth strikes. It also appears that his further intent was to strike those who were involved in prison ministry, which he did with his seventh and eighth strikes. At this point, there was no veniremember remaining *Page 584 
who had expressed any reservation about the death penalty or who was involved in prison ministry. Then, the district attorney used the next seven consecutive strikes to strikeall remaining blacks. Of those remaining blacks, the district attorney could not later give reasons for striking B.H. and T.P.[4] Although he was able to give a reason for striking black veniremember W.B., as we subsequently discuss, we find it to be minimally supported by the record, if supported at all, and to be evidence of disparate treatment. While we acknowledge that the district attorney's reasons for striking the six blacks (other than B.H., T.P., and W.B.) on their face appear to be race-neutral, we cannot conclude, as the state urges, that the record supports the inference that the pattern of the district attorney's strikes shows that they were not racially motivated. In fact, the record supports a reasonable inference to the contrary.
The state further argues that its pattern of strikes was affected by the defense's use of 10 of its 18 strikes to remove white males from the jury and that it was apparent that the defense was attempting to strike all white males. The district attorney suggested, in the hearing on remand, that he did not strike whites initially because the defense was exhibiting a pattern of striking whites and that he waited until close to the end of the striking process to strike those whites that he thought the defense might have eliminated first. However, despite this argument, the fact remains that white veniremembers with characteristics deemed by the district attorney to be undesirable remained after the district attorney had used all his strikes.
Specifically, the district attorney emphasized that he wanted to eliminate anyone who had had any contact or connection with a psychiatrist or psychologist. Indeed, he stated this reason in listing numerous veniremembers whom he would have struck had the defense not struck them first. However, after he had eliminated all blacks from the jury, the district attorney's last strike, who was designated the alternate, was E.C., a white male whose father had remained at Bryce (a state mental institution) for 25 years and had, in fact, died there. In addition, he did not strike C.P., a white female who served on the jury and worked for a psychiatrist as a "therapy assistant." Although the district attorney could not recall why he left this woman on the jury, he speculated that it was probably because she had two small children who had been sexually abused. This reason, however, is not supported by the record. Rather, the record shows this juror's parents-in-law had adopted two children who were victims of sexual abuse. He was reminded that C.P. was a member of the Church of Christ and was a Sunday school teacher there. Furthermore, he failed to strike I.B., a white female whose brother had been treated by a psychiatrist for drug dependency. He explained, at the remand hearing, that she was on his strike list because of her brother's contact with a psychiatrist and because drug abuse, for which her brother had been treated, was a factor in the instant trial. The district attorney also noted that she had moving traffic violations (an assumption for which we can *Page 585 
find no support in the record). This veniremember also possessed an additional characteristic upon which the state heavily relied to justify its striking of O.J., a black male: close association with Brockway Glass. In reiterating the reasons for striking O.J., the black male, the district attorney testified that this veniremember, in addition to having three traffic violations, worked at Brockway Glass, and he explained further:
 "At Brockway Glass we had been there on several occasions investigating theft, embezzlement, and various other activities. Did not know whether Mr. [O.J.] at the time he was struck was actually interrogated . . . by an investigator from our office, but we had a rather lengthy investigation there where many, many people were interrogated."
We fail to understand why this same concern did not arise in regard to white veniremember I.B. because her voir dire answers and her information sheet show that her husband was employed by Brockway Glass.[5] Although the district attorney, by his own explanations, had compelling reasons to strike this woman and although he testified that she was on his strike list, he did not save a strike for her. The defense used its last strike against her, and she served as an alternate.
From the district attorney's failure to eliminate these three veniremembers from sitting on the jury (even though two sat as alternates), in the face of there being strong reasons for his striking them and also in the face of the ambiguous nature of three of his preceding strikes against blacks, we conclude that an inference arises that it appears that the district attorney was not acting in conformity with his explained priorities of striking. "If counsel states that he has a plan or strategy for striking jurors, then 'the challenges exercised must be consistent with that strategy.' " Christianson v. State,601 So.2d 512, 515 (Ala.Cr.App. 1992) (quoting Patton, TheDiscriminatory Use of Peremptory Challenges in CivilLitigation: Practice, Procedure, and Review, 19 Tex.Tech L.Rev. 921, 973 (1988)). It appears that the factors that the district attorney considered important in his striking were not consistently applied without regard to race.
The state asks us to re-evaluate our conclusion that the voir dire offers overwhelming evidence that the black potential jurors shared only race as the common denominator and that in all other respects, they were as heterogeneous as the community as a whole. The state argues that they shared more than their race and that they shared characteristics with white veniremembers who were struck. It is true that whites were struck who shared the same characteristics as a number of blacks who were struck. However, conservatively, at least one-third of the district attorney's strikes of blacks do not fall in that category, as will be more thoroughly discussed below: the strike against W.B. for a reason that also applied to at least one white female who sat on the jury and the strikes against T.P. and B.H., for which no reason could be given, who possessed no characteristic for which a white was struck. In regard to T.P., her answers on voir dire and the computer-generated information on her information sheet show that she opposed the use of alcohol; that she had a 15-year-old daughter and two sons, ages 18 and 19 years old; that she was employed by Alabama State University in the maintenance department; that she was 31 years old; and that she had no criminal record. The only possibly contemporaneous handwritten notes on the information sheet are "anti alc. [alcohol]," "3 teens," and "?." B.H., the other veniremember for which no reason could be given, possessed the following characteristics as shown by the record: she was 33 years old, was employed by Maxwell Air Force Base as a child care attendant, was married to an employee of Haigler Hinge, had no criminal record, had a 14-year-old daughter, was acquainted with a previously struck black veniremember, and had Maxwell-Gunter and State Farm Insurance bumperstickers on her automobile. The deputy's information sheet on B.H. contains no handwritten notations that appear to have been contemporaneous with the striking of the jury. *Page 586 
Based on the record, we conclude that these three veniremembers were in all respects, except race, as heterogeneous as the community as a whole. Moreover, the record clearly suggests the inference that these three blacks — one-third of the state's strikes of blacks — shared with the other blacks struck nothing more than their race. Finally, contrary to the state's argument, these three blacks shared no common characteristic with any white veniremember who was struck, such as, "e.g., opposition to the death penalty, prior convictions, they or members of their family treated by a psychiatrist." (Appellee's brief at 40.)
The state also argues that we have erroneously considered as a factor "what appears to be a [history] in the use of peremptory strikes by the Montgomery County District Attorney's office." Freeman, 651 So.2d at 575 (quoting Ex parte Bird, 594 So.2d at 681). It argues that "here there was no past history of discriminatory strikes by this prosecutor, although since the trial of this case, some of the cases tried by specific assistants in the Montgomery County District Attorney's Office had been held by either this Court or the Alabama Supreme Court in violation of Batson." The state further points to the district attorney's testimony, under oath, that he never, as chief prosecutor for Montgomery County, discriminated in selecting a jury.
The state is correct in its assertion that members of the district attorney's staff have violated the principles ofBatson and Ex parte Branch. See, e.g., Ex parte Yelder,630 So.2d 107 (Ala. 1992), cert. denied, ___ U.S. ___,114 S.Ct. 1336, 127 L.Ed.2d 684 (1994) (wherein the Alabama Supreme Court held that the deputy and an assistant district attorney, in using 24 of 32 strikes to remove 24 of 27 black veniremembers in a 1988 trial, violated Ex parte Branch and Ex parte Bird);Ex parte Bird (wherein the Alabama Supreme Court held that the state failed to overcome the inference of discriminatory intent with which the deputy and an assistant district attorney (the same assistant who participated in Yelder's trial) exercised 17 of the state's 20 strikes to eliminate 17 of 19 blacks in a 1987 capital trial; Sims v. State, 587 So.2d 1271
(Ala.Cr.App. 1991), cert. denied, 502 U.S. 1098,112 S.Ct. 1179, 117 L.Ed.2d 423 (1992) (wherein the court held that the deputy's reasons for exercising several of her 14 strikes used to strike 14 of the 16 black veniremembers were not race-neutral); Parker v. State, 568 So.2d 335 (Ala.Cr.App. 1990) (wherein the court held that in 1 of the 6 strikes he exercised against blacks (out of a total of 8 strikes), an assistant district attorney (the assistant who participated in Yelder's and Bird's trials) violated Batson and Ex parteBranch); Williams v. State, 548 So.2d 501 (Ala.Cr.App. 1988),cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218
(1989) (wherein the court found that the deputy's explanations for using 9 of her 12 strikes to remove all black veniremembers, in a 1985 trial, did not satisfy Batson or Exparte Branch). See also Powell v. State, 548 So.2d 590
(Ala.Cr.App. 1988), aff'd, 548 So.2d 605 (Ala. 1989) (wherein the court found an unidentified prosecutor to have violatedBatson and Ex parte Branch in the use of 13 of 16 strikes to remove blacks from jury service in a capital prosecution). However, the district attorney himself has also been found to have violated the principles of Batson and Ex parte Branch. SeeAcres v. State, 548 So.2d 459 (Ala.Cr.App. 1987) (wherein the court held that the district attorney, in using 11 of his 12 strikes to remove blacks from jury service in a 1983 capital trial, failed to satisfy Batson and Ex parte Branch and thus did not overcome the presumption of discrimination). See alsoEx parte Floyd, 571 So.2d 1234, 1236 (Ala. 1990) (wherein the Alabama Supreme Court found that the district attorney's using his first 11 strikes to remove all 11 blacks from the jury in a 1983 capital trial established a clear prima facie case of racial discrimination and remanded to this court "with directions to review [the appellant's] Batson claim in light of what [was] said in th[at] opinion"), on remand, 571 So.2d 1237
(Ala.Cr.App. 1990) (wherein this court reversed the judgment and remanded the cause for proceedings consistent with the supreme court's opinion).[6] As the Bird court *Page 587 
pointed out, what is relevant is that "the Montgomery County District Attorney's office" has "what appears to be a pattern in the use of peremptory strikes." 594 So.2d at 681. We do not consider that the assertion urged by the state — that it was only his staff, and not the district attorney himself, who has been found to discriminate — is factually correct, nor do we find that even if it were factually correct, it would absolve the district attorney of the responsibility for his staff's failure to observe the requirements of Batson and Ex parteBranch.
We further note, as relevant to the establishment of a prima facie case of racial discrimination, that the record shows disparate treatment of white and black veniremembers who shared the same characteristics, which we discuss later. "Such disparate treatment furnishes strong evidence of discriminatory intent." Ex parte Bird, 594 So.2d at 681. We further note, in regard to the district attorney's unexplained strikes of blacks, that "the State's failure to articulate a legitimate reason for one or more strikes may constitute one of the 'facts and . . . other relevant circumstances [that will] raise an inference' of discrimination. State v. Antwine, 743 S.W.2d 51,64 (Mo. 1987)." Ex parte Bird, 594 So.2d at 680. Finally, the appellant "is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' " Batson, 476 U.S. at 96,106 S.Ct. at 1723 (quoting Avery v. Georgia, 345 U.S. 559, 562,73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953)).
From the establishment of this prima facie case of discrimination arose the presumption that the district attorney used his peremptory challenges to discriminate against black prospective jurors on account of their race. See Ex parteBranch, 526 So.2d at 623 (citing Batson, 476 U.S. at 97,106 S.Ct. at 1723). "The state then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory." Ex parte Branch, 526 So.2d at 623 (emphasis in original). "[This] burden of production . . . increases in proportion to the strength of the defendant's prima facie case." Ex parte Bird, 594 So.2d at 680. "[T]he existence of anumber of suspicious factors [leading to a presumption of discrimination] requires a more cogent explanation in rebuttal." Id. (emphasis in original). Accord Ex parte Carter,627 So.2d 1030, 1033 (Ala. 1993). Thus, we must examine the district attorney's proffered explanations for his strikes in light of a particularly strong prima facie case. See Ex parteYelder, 630 So.2d at 109 (wherein the Alabama Supreme Court stated that "the sheer weight of statistics such as these[7]
raises a strong inference of racial discrimination requiring clear and cogent explanations by the State in rebuttal");Kynard v. State, 631 So.2d 257, 264 (Ala.Cr.App. 1993) (wherein the court found a "strong prima facie case" on the following facts: the prosecutor used 85% of his strikes to eliminate blacks from a venire of which blacks comprised 35%; only 2 blacks sat on the jury, thus blacks comprised only 17% of the jury; the fourth judicial circuit had a pattern of discriminatory striking; and the prosecutor's exclusion of veniremembers, both men and women, whose characteristics varied widely in age, occupations, and social or economic conditions indicated that race may have been the deciding factor).
In analyzing whether the trial court clearly erred in finding that the state met its burden in providing race-neutral reasons for its strikes, we are guided by the Alabama Supreme Court's opinion in Bui v. State, 627 So.2d 855 (Ala. 1992). In that case, the state could not recall, five years after jury selection, its reason for its 11th strike, which was 1 of the state's 13 strikes and 1 of 9 used to remove 9 of the 13 black veniremembers. Of the remaining four black veniremembers, one was eliminated by the defense, two were challenged for cause by the state, and one sat *Page 588 
on the jury. In concluding that it could not hold that the trial court's finding of an absence of racial discrimination with respect to the state's 11th strike was "clearly erroneous," id. at 860, the Bui court reasoned, as follows:
 "Recently, in Huntley v. State, 627 So.2d 1013
(Ala. 1992), this Court held that in reviewing allegations that the prosecutor exercised the state's peremptory strikes in a racially discriminatory manner, 'the reviewing court's inquiry . . . shall not be restricted by the mutable and often overlapping boundaries inherent within a Batson-analysis framework, but, rather, shall focus solely upon the "propriety of the ultimate finding of discrimination vel non." ' 627 So.2d at 1015, quoting United States v. Forbes, 816 F.2d 1006, 1010 (5th Cir. 1987), in turn quoting Merrill v. Southern Methodist University, 806 F.2d 600, 605 n. 6 (5th Cir. 1986). In United States v. Forbes, the Fifth Circuit Court of Appeals, upholding the defendants' convictions, noted:
 " 'The Eleventh Circuit has observed, correctly we think, "Failure by a prosecutor to explain every peremptory strike of black jurors is not necessarily fatal to the prosecutor's ability to rebut a prima facie case; likewise, explanation of most of the strikes on nonracial grounds does not necessarily" satisfy his burden. United States v. David, 803 F.2d 1567, 1571 (11th Cir. 1986).
 " 'In this case, the prosecutor's third strike, though unexplained, seems unlikely to have been the result of intentional discrimination. The confluence of the following facts leads to this conclusion: (1) the black/white ratio on the jury mirrored that of the venire; (2) the prosecutor adequately explained two strikes; (3) the prosecutor did not use all his strikes; (4) there were two blacks left on the jury. Although the existence of fewer than all or most of these circumstances might be insufficient to prevent or rebut an inference of intentional discrimination, see Fleming v. Kemp, 794 F.2d 1478, 1483 (11th Cir. 1986) ("[N]othing in Batson compels the district court's conclusion that constitutional guarantees are never abridged if all black jurors but one or two are struck because of their race."), the Court is mindful of Justice Holmes's comment in a different context that "we cannot let the fagot be destroyed by taking up each item . . . separately and breaking the stick." Edwards v. Chile Copper Co., 270 U.S. 452, [454] 46 S.Ct. 345, 346 [70 L.Ed. 678], . . . (1926). There is significance, perhaps determinative significance, in the coexistence of these facts.'
"816 F.2d at 1011 n. 7.
". . . .
 "If all the facts in the present case are carefully considered (i.e., that Bui, who is Vietnamese, was tried for these murders before the United States Supreme Court's decision in Powers; that there was almost a five-year delay in requiring the prosecutors in this case to come forth with the reasons for striking blacks from the venire; that race-neutral reasons were given for striking eight of the nine black persons removed from the venire by the state; that this case does not involve a black defendant or a black victim; that one black person served on the jury (the prosecutors had the opportunity to strike this black person also, but did not); that the defense struck one black person from the venire; and that one of the most distinguished black circuit judges in this state was not convinced that the state's strikes were racially motivated), we cannot hold that the trial court's finding of an absence of racial discrimination with respect to the state's 11th strike was clearly erroneous. See Ex parte Branch."
627 So.2d at 859-60.
Thus, in accordance with Bui, we turn to the circumstances of this case to consider whether their "cumulative weight and confluence" support the trial court's finding that the prosecution's strikes were not racially motivated. Cox v.State, 629 So.2d 670, 672 (Ala. 1993) (following this approach to conclude that the trial court's finding that the state's reasons were "race-neutral" was not clearly erroneous). *Page 589 
First, we note that, as was the case in Bui, race was not a factor in this case; this case did not involve a black defendant or black victims. Moreover, like the Bui prosecutor, the district attorney was asked to recall his reasons after a long lapse of time and after having exercised his strikes at a time when he had little reason to think that he would later have to recall those reasons because Powers had not yet been decided. Furthermore, the district attorney was forthright in admitting that he could not recall his specific reasons for exercising several of his strikes. We also note that the defense struck one black.
However, we must also consider the following circumstances:
(1) We cannot ignore the impact of the prosecution's strikes, which eliminated 90% of the black veniremembers: while blacks constituted nearly 21% of the veniremembers eligible to sit on the jury, no black sat on the jury. See Newman v. State, [Ms. CR-91-961, November 25, 1992] ___ So.2d ___, ___ (Ala.Cr.App. 1992) (Bowen, J., dissenting), rev'd, [Ms. 1920659, May 21, 1993] ___ So.2d ___ (Ala. 1993) (adopting Judge Bowen's dissent) ("[i]n determining 'the propriety of the ultimate finding of discrimination vel non,' Huntley v. State,627 So.2d 1013 (Ala. 1992), this is a significant (although not controlling) factor to consider"). See also Ex parte Bird, 594 So.2d at 680 (wherein the Alabama Supreme Court, in weighing the statistical evidence (venire was 36% black; jury was 8% black), stated that "[t]his fact alone reveals a disparate impact and immediately arouses suspicion of the existence of discriminatory intent"). Compare Cox (wherein the Alabama Supreme Court affirmed the trial court's finding of no racial discrimination where the black/white ratio on the jury was the same as the black/white ratio of the venire and where 4 blacks sat on the jury).
(2) Had blacks been left on the venire and had the district attorney foregone striking those blacks from the venire, it would have weighed in his favor. However, no blacks were left on the venire and, thus, we cannot conclude that, if given any additional opportunity to strike a black, the district attorney would have foregone that opportunity. Compare Cox; Bui.
(3) The trial judge who presided over the jury selection was not the judge who reviewed the jury selection and made the findings on remand. For recognition of the importance of firsthand observation of the voir dire proceedings, see, e.g.,Huntley, 627 So.2d at 1015 (wherein the Alabama Supreme Court stated that "because appellate courts defer to the trial judge's objective observation of the voir dire process, considerations of justice invite a contemporaneous record, rather than post hoc excuses offered by the State long after the events have faded from the trial judge's memory") (emphasis in original); Branch, 526 So.2d at 624 (wherein the Alabama Supreme Court noted that "the trial judge must make a sincere and reasonable effort to evaluate the evidence and explanations based on the circumstances as he knows them, his knowledge of trial techniques, and his observation of the manner in which the prosecutor examined the venire and the challenged jurors").See also Mitchell v. State, 579 So.2d 45, 50 (Ala.Cr.App. 1991), cert. denied, 596 So.2d 954 (Ala. 1992) (wherein the court quoted United States v. Young-Bey, 893 F.2d 178, 180-81
(8th Cir. 1990), observing that the trial court "plays a 'pivotal role' in determining whether a prima facie case has been made under Batson because [it] observes the voir dire procedure firsthand and is in a far better position than we to assess the prosecutor's decisions"). The judge sitting on remand acknowledged that his not sitting as the trial judge was a handicap to his consideration of the Batson question.
(4) Neither the trial judge nor the judge on remand is black.Compare Bui, 627 So.2d at 860 (wherein the Alabama Supreme Court, in holding that the trial court's ruling of no discrimination was not clearly erroneous, considered as a key circumstance the fact that "one of the most distinguished black
circuit judges in this state was not convinced that the state's strikes were racially motivated") (emphasis added). See alsoid. (Adams, J., concurring specially) (wherein Justice Adams stated that the weight to be accorded the trial court's finding of no discrimination *Page 590 
is "significantly magnified if the trial judge himselfshares the race of the challenged veniremembers") (emphasis in original).
(5) Another consideration, which is before us by judicial notice, is "the frequency of judgments from the particular judicial circuit involved that have been reversed because of discriminatory jury selection." Huntley, 627 So.2d at 1015. As the Bird court noted, the Montgomery County District Attorney's office has exhibited "what appears to be a pattern in the use of peremptory strikes." 594 So.2d at 681.
(6) Although not of great significance, we note that the district attorney did not have the notes he made and considered during the voir dire selection. Compare Adkins v. State,639 So.2d 515, 518 (Ala.Cr.App. 1993), aff'd, 639 So.2d 522 (Ala. 1994) (wherein the court noted that "[t]he record reflects that all of the notes made by the prosecutor during the voir dire selection were received into evidence at the Batson hearing and were available to defense counsel" and that the information upon which the prosecutor based his reason for striking a black, although not reflected in the veniremember's answers to the voir dire questions, was "indicated on his notes made during the voir dire of the prospective jurors, where the prosecutor named the individuals who supplied him with this information").
(7) Finally, we cannot hold upon the facts in this case, as the Bui court held, that the prosecutor provided adequate race-neutral explanations for his strikes. Here, we need analyze only a few of the district attorney's strikes to reach this conclusion.[8]
First, we examine the prosecution's strike of W.B., a black male. To explain this strike, the district attorney stated the following:
 "Mr. [B.] was seventy-two years old at the time.[9] That is the only — other than the fact when he was questioned by the court, I took it that he was single.
 "I have struck people on juries before if they appear to me to be elderly and that jury service would cause them some discomfort. To be quite honest with you, that was probably the reason. But I cannot, again — I think the age factor is why I did that, but it has been three or four years ago or several years ago. I don't have any of my own personal notes."
To review the state's assertion that age was a valid race-neutral reason under the circumstances before us,[10] we first look to the information revealed in W.B.'s answers to the voir dire questioning: he was a former deputy sheriff; he owned a pistol for personal protection; he was retired from "7-11," presumably the convenience store corporation; he had served on a jury that had returned a guilty verdict for murder (a circumstance the district attorney considered to be a "plus" in regard to another veniremember); he had been a grand jury witness on a first degree murder case; and he opposed the use of alcohol. He did not respond to the following questions: whether anyone, for whatever reason, did not feel that he or she could sit on this sequestered jury; whether anyone had any reason whatsoever, anything personal, that would prevent him or her from sitting as a juror; whether anyone could not read, speak, or understand English, and follow instructions in the English language; whether anyone was unable to sit as a juror because of "a physical or mental problem of any nature"; and whether anyone had any eyesight or reading problem that might prevent or hinder him or her from considering written exhibits. Moreover, the transcript of the voir dire examination does not indicate *Page 591 
that any question had to be repeated for him or that he was asked to repeat any answer. The state's computer-generated information sheet on this veniremember shows that he had no prior criminal record/history. The presumably contemporaneous notes on the sheet are "age," "Old," "Verdict — GA — G," "Former dep. sheriff," and "NO."
"[I]n certain cases, [a veniremember's] age may be a sufficient reason to defeat the prima facie case of discrimination." Ray Sumlin Constr. Co. v. Moore,583 So.2d 1320, 1322 (Ala. 1991).
 "[W]e realize that in certain cases age may serve as a legitimate racially neutral reason for a peremptory strike. See Harrell [v. State], 555 So.2d [263,] 268 n. 1 [(Ala. 1989)]. However, the age rationale is highly suspect because of its inherent susceptibility to abuse. Batson, 476 U.S. at 106 [106 S.Ct. at 1728] . . . (Marshall, J., concurring) ('[a]ny prosecutor can easily' ground a challenge upon an allegation that a 'juror had a son about the same age as the defendant'). A mere summary declaration that age was a factor in the decision to strike is, therefore, constitutionally deficient and warrants reversal. Owens v. State, 531 So.2d 22, 26 (Ala.Crim.App. 1987)."
Ex parte Bird, 594 So.2d at 682-83. Accord Kynard, 631 So.2d at 269; Joyce v. State, 605 So.2d 1243 (Ala.Cr.App. 1992). Seealso Ex parte Branch, 526 So.2d at 626 n. 13 (wherein the Alabama Supreme Court noted that "[s]trikes based on 'age,' while sometimes relevant, are basically 'group-based' strikes").
Even taking the district attorney's explanation at its most favorable interpretation — he probably struck W.B. because W.B. probably looked elderly and, based upon that probable appearance, he probably assumed that W.B. would experience discomfort if required to sit on the jury — we have serious doubt that that explanation is race-neutral, when taking all of the other facts of this jury selection into account. We consider the strike of W.B., taking the explanation in a light most favorable to the state, to be somewhat akin to the following explanation of a strike of an 80-year-old black woman in Williams, 548 So.2d at 506-07, by the same deputy who participated in the selection of the instant jury:
 "The primary consideration was the advanced age of Mrs. [E.R.]. [T]he state was concerned about her ability to be physically present and her ability to hear, be awake during the trial, and meaningfully participate in the deliberations. This possibility was exacerbated by the necessity of a sequestered jury in a capital case [sic]."
Id. at 506. In reviewing this explanation, the Williams court stated the following:
 "[W]e have grave doubt as to whether [the reason for striking E.R., that she was 80 years of age,] is race-neutral, especially when it is considered in the context of the circumstances and the other explanations. She obviously had been selected for jury service and was willing to serve; otherwise, her name would not have been on the venire list. The prosecutor's assumption that she would have difficulty hearing and staying awake during the trial or would find sequestration difficult is not supported by voir dire examination. Moreover, these considerations did not need to be based on any speculation, for obviously the prosecutor had the opportunity to observe this venireperson and, thus, knew whether she could hear the questioning, stay awake, and 'meaningfully participate.' We further note the prosecutor's curious reference to this case as being a capital case, for this was a drug prosecution."
Id. at 507. The court finally noted that it rejected the age-based bias, under the facts before it, because the veniremember was struck "without being examined on voir dire in reference to any possible bias" she might have had because of her age and that such "raises a strong inference that [she was] excluded on the basis of race alone." Id. Cf. Ex parte Branch, 526 So.2d at 624 (wherein the Alabama Supreme Court recognized, as one of the types of evidence that show that the reason offered was a sham or pretext, an explanation based on a group bias where the group trait is not shown to apply to the challenged veniremember specifically). *Page 592 
We cannot conclude that the record offers sufficient factual support to consider this particular strike to be race-neutral. Rather, the record supports the contrary conclusion. Foremost, the district attorney's stated explanation is based on ambiguous probability. While we recognize that we must temper this observation with the fact that the district attorney's memory was understandably hampered by the passage of time, we must nevertheless take into account what the trial court characterized as the state's "limited explanation" of its strike of W.B.. See Acres, 548 So.2d at 473 (wherein, in rejecting this same district attorney's explanations for his strikes, which he professed were not based upon independent recollection, but upon probability, the court noted that because "[h]is explanations deal only with probabilities[, the court] can only speculate as to his reasons, as he did").
Moreover, the district attorney probably relied on thebare assumption that, because W.B. probably looked elderly, he would experience discomfort sitting on a sequestered jury. We consider such an assumption, without sufficient factual support, to constitute a summary declaration of the type condemned in Ex parte Bird. In other words, an elderly appearance does not necessarily indicate any disability or discomfort. W.B.'s failure to affirmatively respond to any voir dire question designed to elicit any problem a juror might have with sitting on a jury undermines the district attorney's probable reliance on his assumption. "An explanation that is refuted, or not borne out, by the juror's statements on voir dire is insufficient to overcome the presumption of racial discrimination." Kynard, 631 So.2d at 270 (quoting Adkins, 639 So.2d at 520 (Bowen, J., dissenting)). Compare Adkins, 639 So.2d at 518; Williams v. State, 634 So.2d 1034 (Ala.Cr.App. 1993); Bang v. State, 620 So.2d 106, 107 (Ala.Cr.App. 1993).
Because the voir dire offered no support for the district attorney's probable assumption, arising out of W.B.'s probable appearance, that W.B. would experience discomfort if he served on the jury and because the district attorney could provide no basis for his assumption other than the fact that W.B. was 72 years old, we conclude that the only arguable factual support for the district attorney's assumption was the notation "Old" on W.B.'s information sheet. We recognize that the argument could be made that the notation "Old" could have connoted something that the notation "age" did not. However, under the facts before us, we consider such argument to be weak at best. First, the district attorney did not rely on the fact that the information sheet contained the notation "Old" in explaining his strike of W.B. nor did he use it in an attempt to distinguish those veniremembers who were merely older and had the notation "age" on their information sheets from those who displayed problems or characteristics sometimes associated with age. (The state on appeal also did not present any argument based on the notation "Old.") Moreover, the record offers no support for the conclusion that the notation connoted some objective observation or other circumstance that supported the district attorney's conclusion that he probably struck W.B. because W.B. probably looked elderly and thus would have experienced discomfort associated with his age. At the very least, even taking the notation "Old" as support for the district attorney's explanation, without any other support in the record, the district attorney's reasoning was based on mere speculation and is a "mere summary declaration" condemned byEx parte Bird.
Finally, we note that only one other veniremember's information sheet contained, in reference to any disability or condition associated with age, a notation other than "age": the sheet of R.J., a white female who sat on the jury. Although she was only 60 years old, her information sheet shows the presumably contemporaneous, handwritten notations "age" and "sounds looks old." The remaining notations are "crimes" and "TV: start case today." The only information reflected by her voir dire answers and the computer-generated entries on her information sheet is that she had a AAA bumpersticker, knew a little about the case from pretrial publicity, was a housewife, was married to a retiree, and had had a moving traffic violation for speeding within nine months prior to the trial in this case. *Page 593 
In explaining why he did not strike this woman, the district attorney did not mention any effect or consequence of R.J.'s age, but testified, "She had one speeding ticket, but she said she had read all the articles in the paper about the crime, which tended to show me some concern on her part about the lives of the two women who were murdered." The colloquy concerning this juror's exposure to the pre-trial publicity is as follows:
 "THE COURT: . . . . And tell us what you've heard or read about the case, if anything.
 "MS. [J.]: I really don't remember too much about it. I've just seen what was in the paper and on television. And I don't know except that it was concerning two girls.
 "THE COURT: What do you remember being in the paper and on television?
 "MS. [J.]: Nothing really. More about what was on Friday night. They said they was going to have the case today, the murder, you know.
 "THE COURT: What do you recall being on television, is it on television Friday night?
 "MS. [J.]: Well, it was where they was going to have — they would start the case today.
"THE COURT: Is that all you recall?
"MS. [J.]: Uh-huh. (Positive response.)"
The notations that appear on the notes used by the district attorney in his testimony are "— 1988 speeding (moving traffic violation within last 5 years)" and " read articles in paper recently."
Upon these facts, if we conclude that W.B.'s sheet's notation "Old" is support for the district attorney's assertion that he probably struck W.B. because of his age and consequently his discomfort, we find an inference of disparate treatment between W.B., a black male who is "old," and R.J., a white female who "looks sounds old." We reject the state's argument that simply the difference in their ages explains the disparate treatment. A major point of our discussion of this issue centers on the recognized principle that "[a] mere summary declaration that age was a factor" is insufficient to support a strike as race-neutral. It follows that age, without more, under the circumstances here, will not explain away the difference in treatment of two veniremembers who are described in virtually identical terms in relation to the effect that age has had on them. In the alternative, if we do not consider the notation "Old" to describe W.B. as appearing to be adversely affected by age, we find an inference of disparate treatment in the district attorney's striking W.B. and not striking V.C., a 71-year-old[11] white woman who sat on the jury. Her voir dire answers and the computer-generated information on the deputy's sheet show that she was a retired housewife, her husband was retired, she had no criminal record, her husband owned a gun, she had had a moving traffic violation within the five years preceding the trial, she had a BS degree, she had been a scout leader and a youth advisor, and her granddaughter had undergone counseling because she (the granddaughter) had been in an accident. "Age" is the only handwritten, presumably contemporaneous notation on the deputy's notes.
While the appellant urges us to find disparate treatment in the district attorney's failure to strike this 71-year-old white female while striking W.B., the state argues that we should not conclude that the strike against W.B. was racially motivated because the district attorney testified that he had a strong reason to keep the 71-year-old white female on the jury even though she was close in age to W.B.: she was affiliated with the Church of Christ, which purportedly openly supports the death penalty. When first asked if he had had a reason to strike this white female, the district attorney stated the following:
 "Well, she said that she had a granddaughter at Alabama Christian College. The theory in my mind — not theory but pretty plain — they have some connections with Church of Christ. Church of Christ publishes *Page 594 
a bulletin on the death penalty and also supports the death penalty under appropriate circumstances and has a brochure called, 'The Christian and the Death Penalty.' I didn't have any reason to strike her."
When later asked to distinguish his striking the 72-year-old black male and not striking the 71-year-old white female, the district attorney explained his reasoning, as follows:
 "Well, many times in my experience, particularly in death penalty cases, counsel for the defendant sometimes would play upon the religious beliefs of jurors. In fact, I have even participated in trials where defense counsel would talk about [it] being unchristian to inflict the death penalty or try to hang some moral guilt trip on jurors. What stood out in my mind was the document — I have got it somewhere — dealing with Christians and Church of Christ and the death penalty where they take the position that it is entirely Christian to inflict the death penalty. If she trusted Alabama Christian College enough to send her granddaughter or allow her granddaughter to attend school there, perhaps she trusted the Church of Christ position on the death penalty. And that was the reason. And I didn't have any indication like that on the other [potential] juror."
The record is absolutely void of factual support that this juror's granddaughter attended Alabama Christian College. The state argues, in brief, that "[w]hile it is true that there is no record support that juror [V.C.] had a grandchild who attended Alabama Christian College, this is the explanation given by Mr. Evans under oath and the defendant presented no evidence at the Batson hearing to rebut this explanation." (Emphasis in brief.) However, it is apparent how the district attorney concluded that this juror had a granddaughter at Alabama Christian College. This juror's sole reference to her granddaughter during the voir dire questioning was in response to the question, "Have you or any member of your family ever received psychological counseling?" Her answer, found on page 744 of the transcript, is, "My granddaughter was in a[n] accident and she's had counseling." When this response was listed on the notes of the deputy (Exhibit 2) with its corresponding page number of the voir dire transcript, it was abbreviated as "Granddaughter in ACC counseled (744)." Although these notes were not used by the district attorney in his testimony at the remand hearing, they were used, along with other information, to compile the notes that he did use at the hearing to aid his testimony (Exhibit 1). The specific notation regarding this female juror, in these latter notes, is "granddaughter at Alabama Christian College — counselled (R. 766)." The words "at Alabama Christian College" and the number "766" are scratched out by a single line, and the notation "in accident " and the number "744" are written above them. Thus, with the editing, the notation reads: "granddaughter in accident counselled (R. 744)."
It is apparent that the district attorney's explanation of his reasons for wanting V.C. as a juror was based solely on the information compiled for the notes from which he testified. It further appears that the district attorney's mistaken impression arose from someone's misconstruing the meaning of the abbreviation "ACC" in transposing notes of information taken from the voir dire to the notes used by the district attorney in his testifying. (Although the misinterpretation was corrected at some point, evidently it was not corrected before the district attorney's testimony.) In light of the apparent explanation of the district attorney's mistake and in light of the absence of this misinformation in the transcript of the jury selection and the accompanying presumably contemporaneous records, we consider it illogical to conclude that information that V.C.'s granddaughter was a student at Alabama Christian College was before the district attorney when this jury was struck. Thus, the record offers no satisfactory reason why this 71-year-old white woman was left on the jury, while the 72-year-old black man was removed from jury service. This matter demonstrates one of the difficulties the district attorney faced in attempting to reconstruct his reasons for exercising his peremptory strikes as he did.
In conclusion, we are left with the inference of disparate treatment regardless of how we treat the description of W.B. as *Page 595 
being "Old." Clearly, the district attorney's striking of W.B. presumably on the basis of age and presumed frailty or discomfort while, without any reason supported by the record, failing to strike the white female juror described in virtually the same terms, or in the alternative, failing to strike a white female juror one year younger constitutes disparate treatment. See, e.g., Ex parte Bird, 594 So.2d at 678, 679, 681 (wherein the Alabama Supreme Court considered to be disparate treatment the deputy's failing to strike a white 74-year-old veniremember while striking two black veniremembers, one who was 78 years old and "might be adversely affected by the length of the trial and the 'gory' photographs it involved" and the other who was 73 years old and "did not raise his hand for the administration of the oath, and had difficulty hearing 'low voices' "). "It is clear that 'disparate treatment furnishes strong evidence of discriminatory intent.' " Kynard, 631 So.2d at 270 (quoting Ex parte Bird, 594 So.2d at 681).
The district attorney's failure to provide a legitimate reason for his strike of W.B. subjects his rationale for his other strikes to greater scrutiny.
 "[E]ven explanations that would ordinarily pass muster become suspect where one or more of the explanations are particularly fanciful or whimsical. As the Supreme Court of Georgia stated:
 " 'The explanation offered for striking each black juror must be evaluated in light of the explanations offered for the prosecutor's other peremptory strikes, and as well, in light of the strength of the prima facie case. The persuasiveness of a proffered explanation may be magnified or diminished by the persuasiveness of companion explanations, and by the strength of the prima facie case.'
"Gamble v. State, 257 Ga. 325, 357 S.E.2d 792, 795 (1987)."Ex parte Bird, 594 So.2d at 683. See also Bui, 627 So.2d at 860 (Adams, J., concurring) (wherein Justice Adams stated that "the State's burden of explanation for one peremptory strike, for which it offers little or no rationale, may, in extraordinary cases, be met by the persuasiveness of its remaining explanations or by the overall circumstances to which it refers in rebuttal") (emphasis in original).
Thus, we must consider the strikes of T.P. and B.H. in light of the district attorney's unsatisfactory explanation of his strike of W.B.. While the district attorney candidly admitted that he could give no explanation for these two strikes, he did state that neither was racially motivated. Not only is the claim of the legitimacy of these two strikes seriously compromised by the pretextual nature of the strike of W.B., it also falls in that category of "mere general assertions" of nondiscrimination and of proper performance of the prosecutor's official duties that is condemned by Batson, 476 U.S. at 94,106 S.Ct. at 1721. The prosecutor may not rebut the defendant's prima facie case "merely by denying that he had a discriminatory motive or 'affirm[ing] [his] good faith in making individual selections.' " Id. at 98,106 S.Ct. at 1723-1724 (quoting Alexander v. Louisiana, 405 U.S. 625, 632,92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972)). Cf. Ex parteBankhead, 625 So.2d 1146, 1148 (Ala. 1993) (wherein the Alabama Supreme Court noted that "nonspecific 'reasons' are generally insufficient because they are inherently untestable; there is simply no way to compare the prosecutor's statement with any objective fact to ascertain whether the prosecutor is truly relying on the reason he articulates") (emphasis in original).
Considering the confluence of all of these circumstances along with the strength of the appellant's prima facie case, we are compelled to hold that the state did not overcome the presumption of discrimination. Most significantly, this is not a case where the state provided clear, specific, race-neutral reasons for all of its strikes except one where no other negative circumstance was noted. Compare Bui. Rather, the reasons given for at least three of the district attorney's nine strikes of blacks — W.B., T.P., and B.H. — are highly suspect and do not, in our opinion, overcome the appellant's strong prima facie case. The state failed to carry its burden of giving "clear, specific and legitimate" reasons related to this case. We cannot uphold the trial court's finding that "there is no evidence to suggest these venire members were excluded *Page 596 
other than for race neutral reasons." We are compelled to find that the trial court's finding was clearly erroneous under the circumstances before us. See, e.g., Huntley (wherein the Alabama Supreme Court affirmed this court's finding that the state had exercised its strikes in a racially discriminatory manner where, although five blacks served on the jury, the state's reasons for two of its five strikes of blacks were clearly not race-neutral and for two others were highly suspect); Siler v. State, 629 So.2d 33, 36-37 (Ala.Cr.App. 1993) (wherein the court held that the prosecution failed to meet its burden in rebutting the appellant's prima facie case where one of its strikes was made on the ground that "we were just searching for strikes" and where 28.5% of the venire was black and the prosecution used 11 of its 15 strikes against blacks, leaving one black on the jury (8%)).
In conclusion, we turn to the state's assertion, in argument to several points, that we cannot consider certain evidence that had been before the trial court because it was not explicitly argued to the trial court. For example, in response to the appellant's assertion that disparate treatment can be inferred by the district attorney's removal of W.B. in the face of his failure to remove R.J., the state argues that we should disregard this argument because it is raised for the first time on appeal.
We find the state's argument to be without merit. InHuntley, 627 So.2d at 1014-17, the Alabama Supreme Court explained the rationale for not cleanly severing the steps in the procedural framework of Batson and Ex parte Branch, as follows:
 "Th[e Batson] hearing provides the defendant the opportunity to marshal all available evidence in order to construct a prima facie case of discrimination. Ex parte Branch, 526 So.2d 609, 620
(Ala. 1987); Ex parte Jackson, 516 So.2d 768, 772
(Ala. 1986) (quoting Batson, 476 U.S. at 96-97
[106 S.Ct. at 1722-1723] . . .). If the circumstances raise an inference of discrimination, the State must attempt to justify its challenges, the burden having shifted to the State to rebut the defendant's prima facie case. Ex parte Bird, 594 So.2d 676, 680 (Ala. 1991). Following the State's explanations, the defendant may offer rebuttal evidence 'showing that the reasons or explanations are merely a sham or pretext' for racial discrimination. Ex parte Branch, 526 So.2d at 624 (citing People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978)).[1]
 "Although each logical step within this procedural framework is theoretically severable, considerations of justice, expediency, and judicial economy oppose a slavish adherence to the framework in practice. . . .
 ". . . [M]any of the same factors are equally relevant at more than one logical step in a Batson analysis framework. For example, a defendant may both construct a prima facie case and rebut the State's proffered explanations by showing that the prosecution exercised (1) desultory voir dire, (2) 'disparate examination of members of the venire,' (3) 'disparate treatment' of veniremembers who shared certain characteristics other than race, and (4) a number of challenges to black veniremembers disproportionate to their representation on the venire. Ex parte Branch, 526 So.2d at 623-24. Thus, the evidence that was, or could have been, propounded by the defendant in rebuttal of the prosecution's explanations rests within the breast of the trial judge, and, necessarily, actuates his judgment as to whether the defendant has presented a prima facie case.
 "Because this evidence, in conjunction with the explanations presented by the prosecution, was necessarily considered by the trial judge, it is ripe for review. The Court of Criminal Appeals does not err, therefore, in reviewing all the evidence of record, including those facts of which it may take judicial notice, such as the frequency of judgments from the particular judicial circuit involved that have been reversed because of discriminatory jury selection. Ex parte Bird, 594 So.2d at 681; Warner v. State, 594 So.2d 664, 672
(Ala.Crim.App. 1990), reversed on other grounds, Ex parte Bird, supra. This is true even where the trial judge has expressly *Page 597 
determined that the defendant failed to present a prima facie case. Indeed, a rule that so places form over substance as to require the reversal of an appellate judgment solely for alleged digressions from a framework, which, as we have discussed above, involves mutable and overlapping boundaries, would ill serve the people of Alabama who depend on an efficiently functioning justice system.
". . . .
 ". . . Consequently, we hold that in reviewing allegations that the prosecution has exercised its peremptory challenges in a racially discriminatory manner, the reviewing court's inquiry . . . shall not be restricted by the mutable and often overlapping boundaries inherent within a Batson-analysis framework, but, rather, shall focus solely upon the 'propriety of the ultimate finding of discrimination vel non.' Merrill v. Southern Methodist University, 806 F.2d 600, 605 n. 6 (5th Cir. 1986); see United States v. Forbes, 816 F.2d 1006, 1010 (5th Cir. 1987).
(Footnote omitted; emphasis in original.) Based on this explanation, we reject the state's argument that we cannot review all of the evidence before the trial court and all of the conclusions to be plainly drawn from that evidence unless explicitly pointed out to the trial court. The effect of any other holding would be to allow the state to pass its burden to the appellant. For example, the state asserts that had the appellant "pointed out th[e] alleged disparate treatment [of W.B. and R.J.], the State could have then given its reasons for not striking juror [R.J.]." However, the district attorney did give his reason for striking R.J., although not in the context of disparate treatment of W.B.. Are we to ignore that testimony simply because the appellant did not specifically argue it? We think not.
As a final note, we point out that even after theBui court's ruling that it is not necessarily a Batson
violation that the prosecution cannot give a race-neutral reason for every one of its strikes, it is well settled that "a single instance of purposeful racial discrimination in the use of peremptory strikes [i.e., the prosecutor using one peremptory strike in a racially discriminatory manner] does violate Batson," Ex parte Carter, 627 So.2d at 1032.
 "We fully recognize that 'the removal of even one juror for a racially discriminatory reason is a violation of the equal protection rights of both the excluded juror and the minority defendant.' Ex parte Jackson, [640] So.2d [1050] (Ala. 1993). See also . . . Ex parte Bankhead, 625 So.2d 1146[, 1148] (Ala. 1993) ('the failure to articulate a sufficient race-neutral reason for excluding even a single black veniremember may entitle the defendant to a new trial')."
Wright v. State, 641 So.2d 1274, 1274 (Ala.Cr.App. 1993). Seealso Harrell v. State, 555 So.2d 263, 267 (Ala. 1989).
For the foregoing reasons, the judgment must be reversed and the cause remanded for a new trial. We recognize that certainly, by all practical standards, the district attorney was at a substantial disadvantage in being required to state his reasons over three years after the fact. However, this court is bound by the opinions of the United States Supreme Court and the Alabama Supreme Court in these matters.
Although we have reversed the judgment and ordered a new trial because of a Batson violation, we call the trial court's attention to three other issues raised by the appellant in his brief.
In Issue I of the appellant's brief, he correctly points out that the trial court erred in the sentencing phase of the trial in failing to find as a statutory mitigating circumstance under § 13A-5-51(1), Ala. Code 1975, that he had no significant history of prior criminal activity. The presentence report shows that the appellant had no adult criminal record. It does show a juvenile record. The trial court, in rejecting the mitigating circumstance under § 13A-5-51(1) and in finding that the appellant had a significant history of prior criminal activity, obviously *Page 598 
based its finding on the appellant's juvenile record. To do so was error. Only convictions can negate the statutory mitigating circumstance of no significant history of prior criminal activity. Cook v. State, 369 So.2d 1251 (Ala. 1979); Hallfordv. State, 548 So.2d 526 (Ala.Cr.App. 1988), aff'd,548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354,107 L.Ed.2d 342 (1989).
In Issue VIII in the appellant's brief, he contends that the trial court's instructions to the jury regarding its role in determining the voluntariness of his confession and the weight and credibility to be given the confession constituted reversible error. The trial court's instructions in this regard were as follows:
 "With regard to the alleged confession or statement of the defendant, you may consider all of the facts and circumstances surrounding the taking of the alleged confession or statement in determining the weight or credibility, if any, which you give to the alleged confession or statement.
 "In exercising your exclusive prerogative of determining the credibility of the evidence in this case or the weight to which the evidence is properly entitled, the jury shall consider the circumstances under which the alleged confession was obtained, including the situation and mutual relations of the parties. While the Court determines the voluntariness of the confession, the jury determines its weight, or credibility, and may disregard an alleged confession or statement which is unworthy of belief or which they entertain a reasonable doubt as to its truth."
In Ex parte Singleton, 465 So.2d 443, 446 (Ala. 1985), the Alabama Supreme Court stated the rule applicable to the determination of voluntariness of a confession and the weight to be given it, as follows:
 "Correctly stated, whether a confession was voluntary rests initially with the trial court; once the trial judge makes the preliminary determination that the confession was voluntary, it then becomes admissible into evidence. Thereafter, the jury makes a determination of voluntariness as affecting the weight and credibility to be given the confession." (Emphasis in original.)
Further, the Singleton court quoted the rule from Duncan v.State, 278 Ala. 145, 165, 176 So.2d 840, 859 (1965), as follows:
 "We are clear to the conclusion that whenever a motion is made for the question of the voluntariness of the confession to be determined outside the presence of the jury, the motion should be granted. In such a hearing, the trial judge sitting alone should make a determination upon a proper record of the issues of voluntariness. . . . If the confession is held voluntary and admitted, the jury's consideration of that confession and surrounding circumstances shall proceed in accordance with the 'Orthodox' procedure, that is, the jury considers the voluntariness as affecting the weight or credibility of the confession."
465 So.2d at 446-47 (emphasis added in Singleton).
"It is improper for a trial judge to disclose to the jury that he made a preliminary determination that a confession was voluntary and, therefore, admissible." Id. at 446.
In Issue XVII of the appellant's brief, he contends that the trial court's jury instructions defining reasonable doubt were constitutionally deficient. He relies on Cage v. Louisiana,498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). While we find it unnecessary to determine in this case whether the instructions met constitutional standards, we caution the trial court about the reasonable doubt instructions and call its attention to the holding in Cage v. Louisiana and in the Alabama cases applying that ruling. See, e.g., Ex parte White,587 So.2d 1236 (Ala. 1991), cert. denied, 502 U.S. 1076,112 S.Ct. 979, 117 L.Ed.2d 142 (1992); Williams v. State,601 So.2d 1062 (Ala.Cr.App. 1991), aff'd without opinion, docket no. 190682 (Ala.), cert. denied, ___ U.S. ___, 113 S.Ct. 417,121 L.Ed.2d 340 (1992); Martin v. State, 548 So.2d 488 (Ala.Cr.App. 1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970,110 S.Ct. 419, 107 L.Ed.2d 383 (1989). See also Victor v.Nebraska, ___ U.S. ___, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).
For the reasons discussed above, the judgment is reversed and the case remanded for a new trial.
REVERSED AND REMANDED. *Page 599 
BOWEN, P.J., and TAYLOR and McMILLAN, JJ., concur.
MONTIEL, J., recuses himself.
[1] The district attorney who selected the jury is Mr. Jimmy Evans. At the time of the remand hearing, Mr. Evans was the attorney general. His deputy at trial was Ms. Ellen Brooks who, at the remand hearing, was the district attorney. For purposes of this opinion, Mr. Evans will be referred to as "the district attorney," and Ms. Brooks will be referred to as "the deputy."
[2] Actually, in our original opinion, we stated that the state struck 9 of 11 blacks. However, as noted above, we have adjusted that latter figure pursuant to the appellant's argument.
[3] Since our reliance on Bui in our opinion in this case, our finding of purposeful discrimination in Bui has been reversed by the Alabama Supreme Court in Bui v. State, 627 So.2d 855
(Ala. 1992). This reversal does not, however, affect our finding of a prima facie case of discrimination in this case or our holding that the finding by the judge on remand of no discrimination was clearly erroneous, which we subsequently discuss.
[4] In regard to T.P., the district attorney first stated, "I don't have real independent recollection why this juror was struck. I have some notes furnished to me, [the deputy's] notes. There are pluses and minuses there, but I really can't — in all candor, I don't have any independent recollection." Then, the deputy asked, "Do the notes indicate whether or not she had two sons of approximate age of the defendant at the time?" The district attorney then explained the following:
 "The notes kept, which were available to me at the time of striking, was that she had three children, and she had no husband. She had sons the same age of the defendant. [W]hether or not these notes prompted me to strike that juror, in all likelihood they did, but I can't say that from an independent recollection. . . . The notes are helpful, but they are not dispositive of an independent recollection. In this case, in all candor, I can say the notes were kept, but the only thing I can tell you is it wasn't racial, but I can't really sit down here in all candor and say this is the reason why this juror was struck."
The trial court evidently construed this testimony to not set forth a specific reason for the striking of T.P., for the court found that "[t]he reasons for the elimination of this juror could not be recalled." The state construed this testimony likewise; it did not advance any specific reason for this strike.
[5] Although this veniremember stated that her husband was employed by "Owens Brockway," her information sheet shows that her husband was employed by "Brockway Glass."
[6] No return to remand was filed in Floyd. The certificate of final judgment was issued on December 4, 1990. From the absence of any further action in this court, we assume that the Batson
issue was decided, by the trial court, adversely to the prosecution.
[7] The Yelder venire was 31% black; the state used 24 of its 32 strikes (75%) to remove 24 of 27 black veniremembers; two blacks sat on the jury.
[8] By discussing only a few of the district attorney's strikes, we do not mean to indicate that we have found no other explanations or conditions that are problematic.
[9] The deputy's information sheet shows that W.B.'s birthdate is March 29, 1916, and that he was 72 years old on August 14, 1989, the date at the top of the information sheet and the date that the trial commenced. However, assuming that the birthdate reflected on the sheet is correct, W.B. was 73 years old on August 14, 1989. Because both parties refer to W.B. having been 72 years old, we will do likewise.
[10] In its brief, the state stated that while the district attorney noted the fact that W.B. was single, "it is clear that this was not the reason Mr. Evans struck this juror." (Footnote omitted.)
[11] The deputy's sheet shows that this juror's birthdate is June 8, 1917, and that she was 71 years of age on August 14, 1989. However, assuming that the birthdate is correct, she was 72 years old on that date. Because the parties refer to this juror as being 71 years old on that date, we will do likewise.
[1] "Alternatively, where he has produced all available evidenceprior to the State's explanations, the defendant may . . . rest upon the arguments advanced at his initial showing rather than reiterate many of the same contentions."